UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| NEW NGC, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:10-CV-00022 |
| | ) | |
| ACE AMERICAN INSURANCE | ) | |
| COMPANY, AMERICAN | ) | |
| GUARANTEE & LIABILITY | ) | |
| INSURANCE COMPANY, LIBERTY | ) | |
| INSURANCE UNDERWRITERS INC., | ) | |
| NATIONAL UNION FIRE INSURANCE | ) | |
| COMPANY OF PITTSBURGH, PA, | ) | |
| LUMBERMENS MUTUAL CASUALTY | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PA'S MEMORANDUM IN SUPPORT OF
CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant/Counter-Plaintiff National Union Fire Insurance Company of Pittsburgh, PA

("National Union"), for its Memorandum in Support of its Cross Motion for Partial Summary

Judgment, states as follows:

## INTRODUCTION

Plaintiff/Counter-Defendant New NGC, Inc. and its d/b/a National Gypsum Company

(collectively referred to as "NGC") have been named in numerous lawsuits in which

homeowners claim that NGC supplied defective drywall in 2004 and later, which allegedly

released hazardous gases that caused injury to property and adverse health effects (the "Drywall

Lawsuits"). By this Cross Motion,[1] National Union seeks entry of summary judgment in its

---

[1] National Union filed its Memorandum in Opposition to NGC's Motion for Partial Summary Judgment on March
14, 2011. (DE 116.)

favor that it has no duty to defend or indemnify NGC under general liability policies issued by National Union to NGC, effective January 1, 1993 to January 1, 1999 (the "National Union Primary Policies"). (*See* Ex. B to DE 103 for a representative example of the National Union Primary Policies.) The National Union Primary Policies provide coverage only for "bodily injury" or "property damage" that occurs during the policy period. The Drywall Lawsuits only allege injuries that post-date the policy periods of the National Union Primary Policies.

NGC's only basis for asserting coverage is that certain class action complaints contain putative class definitions that are not limited to a specific time period. Nonetheless, neither the allegations in the complaints, nor the facts most favorable to NGC outside of the complaints, which are properly considered under North Carolina law, raise the potential of any "bodily injury" or "property damage" during the policy periods from 1993 to 1999. Rather, the earliest damage asserted in the Drywall Lawsuits allegedly began in 2004, and the Consumer Products Safety Commission ("CPSC"), the governmental agency tasked with investigating the corrosive drywall problem at issue in the Drywall Lawsuits, states in its own remediation guidelines that a threshold marker of problematic drywall is that it was installed between 2001 and 2008, after the National Union Primary Policies expired.

NGC clearly recognizes that there is no potential injury or damage during the periods of the National Union Primary Policies from 1993 to 1999. NGC initially provided notice of the Drywall Lawsuits pursuant to policies that were on the risk from 2003 to 2009, including commercial umbrella liability policies issued by National Union for annual periods from November 1, 2003 to November 1, 2009 (the "National Union Umbrella Policies"). In December 2009, NGC filed this coverage action seeking a defense under policies in effect from 2003 to 2009. NGC's initial complaint for declaratory judgment did not assert, and the

allegations at issue in the Drywall Lawsuits did not show, that any policies in effect prior to 2003 were potentially implicated. It was not until months later, on June 18, 2010, that NGC sought leave to amend its complaint to assert a right to coverage under the National Union Primary Policies. NGC's lack of success in obtaining a defense from its primary insurer on the risk from 2003 to 2009 prompted the amendment, not any changes in the allegations in the Drywall Lawsuits.

Accordingly, National Union is entitled to entry of summary judgment in its favor that it has no duty to defend or indemnify NGC under the National Union Primary Policies in connection with the Drywall Lawsuits. Alternatively, to the extent this Court declines to enter summary judgment in favor of National Union with respect to its duty to defend or indemnify NGC in the Drywall Lawsuits, this Court should find that National Union has no obligation to pay any defense costs incurred prior to June 18, 2010, the date NGC sought leave to amend its complaint and thus tendered the defense of the Drywall Lawsuits under the National Union Primary Policies.

## STATEMENT OF FACTS

### I.      DEFECTIVE DRYWALL

NGC claims that it has been the target of baseless "copycat" lawsuits asserting that it manufactured defective drywall in its domestic plants and that these lawsuits are the result of "well-publicized litigation against other parties involving defects in drywall imported from China." (DE 103 at 1.) This alleged defect has been well-documented by government agencies, including the Consumer Products Safety Commission ("CPSC"), the Environmental Protection Agency, the Department of Housing and Urban Development, and the Florida Department of Health. The CPSC in particular has been tasked with studying the corrosive drywall problem

and developed recommendations for identifying and remediating problem drywall, which clearly establish that the periods of the National Union Primary Policies are not implicated. As a threshold matter, the CPSC's remediation guidelines require a visual inspection of the drywall that reveals both (1) blackening of wiring or air conditioning coils and (2) "[t]he installation of new drywall (for new construction or renovations) between 2001 and 2008."[2] (Ex. A to DE 116 at 3.)

## II.     THE UNDERLYING DRYWALL LAWSUITS

In 2009 and 2010, NGC was named in approximately ten lawsuits related to allegedly defective drywall. All of the underlying complaints allege that NGC supplied defective drywall that emits various sulfide gases causing corrosion of metals and adverse health effects.

### A.     Individual Complaints

The individual complaints asserted against NGC contain the following pertinent allegations:

- *Clark v. Davis et al. (including National Gypsum Services Company, Inc.),* **Case No. 50-cv-2010-900113.00 (Cir. Ct. of Marshall Cty, Ala.) (individual suit).** The original *Clark* complaint names "National Gypsum Services Company" as a defendant and alleges that "at the time Plaintiffs purchased the residence, the residence was new construction and the residence had not been lived in by anyone else before the Plaintiffs purchased the residence." (Ex. E to DE 81 at ¶ 33.) National Gypsum Services Company did not come into existence until *November 17, 1999*, after the expiration of the National Union Primary Policies. (Exhibit A.)

  The amended *Clark* complaint added New NGC, Inc. as a defendant and alleges that "*[i]n or about 2007,* the Defendants Allen Davis, Davis Heating & Cooling, LLC, Allen Davis Construction LLC, Billy King, King Cash & Carry Building Supplies LLC . . . constructed or caused to be constructed a residence with defective and toxic drywall." (Ex. F to DE 81 at ¶ 10 (emphasis added).) The amended complaint further alleges that

---

[2] NGC incorrectly asserted in its Reply in support of its Motion for Partial Summary Judgment that the CPSC investigation solely pertains to Chinese drywall, "which was not imported until after 2000." (DE 117 at p. 16.) The CPSC guidelines, however, clearly state that while markings on drywall indicating that the drywall is of Chinese origin can be a corroborating factor in identifying problem drywall, "*[t]his does not imply . . . that only Chinese drywall is associated with these problems*." (Ex. A to DE 116 at n. 7.)

"Plaintiffs purchased their home new, located at 2172 Half Section Road in marshal County, Alabama."  (Ex. F to DE 81 at ¶ 1.)

- ***Worthington v. National Gypsum Company***, **No. 0:10-cv-60779 (S.D. Fla.) (individual suit).**  The *Worthington* complaint alleges that the plaintiffs "moved into their home ***on or about August 15, 2006***."  (Ex. B to DE 81 at ¶ 9) (emphasis added).)  The suit was voluntarily dismissed on September 23, 2010.

- ***Crespo v. National Gypsum Company***, **No. 0:10-cv-60780 (S.D. Fla.) (individual suit).**  The *Crespo* complaint alleges that the plaintiff "moved into the home ***on or about December 1, 2006***."  (Ex. C to DE 81 at ¶ 9) (emphasis added).)  The suit was voluntarily dismissed on April 12, 2011.

- ***Downing v. National Gypsum Company***, **No. 2:10-cv-14133 (S.D. Fla.) (individual suit).**  The *Downing* complaint alleges that the plaintiffs "moved into their home ***on or about October 31, 2006***."  (Ex. D to DE 81 at ¶ 9) (emphasis added).)

- ***Palazzolo v. National Gypsum Company***, **No. 0:10-cv-60777 (S.D. Fla.) (individual suit).**  The *Palazzolo* complaint alleges that the plaintiffs "moved into their home ***on or about October 26, 2006***."  (Ex. A to DE 81 at ¶ 9) (emphasis added).)  The suit was voluntarily dismissed on April 11, 2011.

## B.    Putative Class Action Complaints

The putative class action complaints asserted against NGC contain the following

pertinent allegations:

- ***Visintin v. National Gypsum Company***, **0:10-cv-60266 (S.D. Fla.) (putative class action).**  The *Visintin* complaint alleges that ***from "November 2006 until . . . February 2007***, Defendant 84 Lumber delivered shipments of an unknown quantity of sheets of National Gypsum American-manufactured drywall to the Visintin home."  (Ex. G to DE 81 at ¶ 53) (emphasis added).)  The class definition includes "[a]ll owners of residential homes in the United States containing drywall manufactured, sold, distributed, or supplied by National Gypsum who have experienced copper sulfide corrosion of HVAC or electrical systems. . . ."  (Ex. G to DE 81 at ¶ 61.)  This class action was dismissed without prejudice on June 21, 2010, and James and Jennifer Visintin became named plaintiffs in an amended *Brincku* complaint.

- ***Brincku v. National Gypsum Company***, **No. 10-20109 (S.D. Fla) (putative class action).**  The original *Brincku* complaint alleges that ***"[o]n April 29, 2004" and "August 13, 2004,"*** "Banner Supply delivered . . . National Gypsum American-Manufactured drywall to the Brincku home."  (Ex. H to DE 81 at ¶¶ 52-53) (emphasis added).)  The complaint further alleges that "[t]he Garcias moved into their home ***in July of 2004***" and began to experience problems related to National Gypsum's drywall ***"[a]pproximately six months after moving into the home."***  (Ex. H to DE 81 at ¶¶ 10, 58) (emphasis

added).)  The class definition includes "[a]ll owners of residential homes in the United States containing drywall manufactured, sold, distributed, or supplied by National Gypsum who have experienced copper sulfide corrosion of HVAC or electrical systems." (Ex. H to DE 81 at ¶ 62).

The amended *Brincku* complaint was filed on June 24, 2010 and added James and Jennifer Visintin as named plaintiffs.  With respect to the Visintins, the *Brincku* amended complaint alleges that construction of the Visintin home "***began on or about August 2006***, and was completed on or about February 2007." (Ex. I to DE 81 at ¶ 51) (emphasis added).)   The amended complaint identifies National Gypsum's synthetic drywall as the defective drywall.  The class definition includes "[a]ll owners of residential homes in Florida containing synthetic drywall manufactured, sold, distributed, or supplied by National Gypsum from its Apollo Beach Plant who have experienced copper sulfide corrosion of HVAC or electrical systems." (Ex. I to DE 81 at ¶ 59.)  The Apollo Beach Plant did not begin operations until ***2001***.  (DE 85 at ¶ 4.)

The second amended *Brincku* complaint was filed on May 3, 2011.  (Exhibit F.)  The second amended complaint is brought only on behalf of the Brinckus as individual plaintiffs.  Prior to the filing, the Visintins and Garcias dismissed their claims against NGC, and the second amended complaint does not contain any class allegations.  The pertinent allegations remain the same, including that the Brinckus did not move into their home until 2004 and the drywall at issue was manufactured at the Apollo Beach Plant.

- ***Yee v. National Gypsum Company***, No. 3:09-cv-08189 (D. Ariz.) (putative class action).  The *Yee* suit was filed against NGC on October 21, 2009 and identifies Raymond Yee as the named plaintiff.  Prior to suit being filed, a pre-suit complaint concerning Mr. Yee's property was filed with the CPSC, which was known by NGC as the "Lake Havasu, AZ" claim due to the anonymous nature of the CPSC complaint.  (Ex. C to DE 116.)

The *Yee* complaint alleges that the plaintiff "made renovations to his home ***beginning in 2008*** using defective Drywall manufactured by National Gypsum." (Ex. M to DE 81 at ¶ 4) (emphasis added).)  The class definition includes "[a]ll owners and residents of homes in the United States that contain defective Drywall manufactured or sold by Defendants that emits excessive amounts of sulfur as well as any individual or entity that paid for or performed repairs of damage cause by the drywall." (Ex. M to DE 81 at ¶ 13.)  The amended *Yee* complaint defined the class as "[a]ll owners and residents of homes in the United States that contain defective Drywall manufactured or sold by Defendants that emits excessive amounts of sulfur, which have caused or can cause corrosion and/or adverse respiratory health effects, as well as any individual or entity that paid for or performed repairs of damage cause by the drywall." (Ex. N to DE 81 at ¶ 16.)  The *Yee* suit was voluntarily dismissed on April 13, 2011.

- ***Cotilla v. New NGC, Inc.***, 0:10-cv-60172 (S.D. Fla.) (putative class action).  The original and amended *Cotilla* complaints allege that "Plaintiffs' home was built using the Defendants' defective drywall ***in approximately 2006***." (Exs. K and L to DE 81 at ¶ 10)

(emphasis added).) The complaints allege that National Gypsum's "drywall was used in the construction of homes, including Florida homes, *between 2004 and present*." (Exs. K and L to DE 81 at ¶ 18) (emphasis added).) The class definition includes "[a]ll owners and residents of homes in the United States that contain drywall manufactured, recycled, or rebranded by Defendant who have experienced copper sulfide corrosion of appliances, HVAC or electrical systems, as well as any individual or entity that paid for or performed repairs of damage caused by the drywall." (Exs. K and L to DE 81 at ¶ 67.) The plaintiffs filed an unopposed motion to stay their case on June 21, 2010, noting that should the putative class in the *Brincku* amended complaint become certified, the *Cotilla* plaintiffs would fall into that class.

- ***Johnson v. New NGC, Inc.*, No. 2:10-cv-00206 (M.D. Fla.) (putative class action).** The *Johnson* complaint alleges that the Johnson home was built using New NGC's defective drywall in ***"approximately 2005."*** (Ex. J to DE 81 at ¶ 10) (emphasis added).) The complaint further alleges that New NGC's "drywall was used in the construction of homes, including Florida homes, ***between 2004 and present."*** (Ex. J to DE 81 at ¶ 18.) (emphasis added).) The class definition includes "[a]ll owners and residents of homes in the United States that contain drywall manufactured, recycled, or rebranded by Defendant who have experienced copper sulfide corrosion of appliances, HVAC or electrical systems, as well as any individual or entity that paid for or paid repairs of damages cause by the drywall." (Ex. J to DE 81 at ¶ 67.) This complaint was voluntarily dismissed without prejudice on April 6, 2010.

- ***Brucker v. Lowes Home Centers, Inc. et al.*, 2:10-cv-00405 (M.D. Fla.) (putative class action).** The amended complaint was filed on March 31, 2011 and served on NGC on May 2, 2011. It adds NGC as a defendant in the action for the first time. The complaint asserts that "***since before the building boom ended in 2007***, there have been hundreds of cases dealing with defective drywall installed during that period." (Ex. G at ¶ 1.) The complaint asserts that "***in or around September 2005***, Mr. Brucker began construction on his home in Arcadia, Florida.... ***On or about May 26, 2006***, Mr. Brucker personally and unknowingly purchased defective domestically-produced National Gypsum drywall." (Ex. G at ¶¶ 40-42.) The class definition includes: [a]ll owners of residential homes in the United States containing defective drywall designed, manufactured, sold, distributed, or supplied by National Gypsum which emits corrosive and odorous sulfide gas." (Ex. G at ¶ 45.)

The only lawsuits presently pending against NGC are the *Clark*, *Brincku* and *Brucker*. Only the *Brucker* suit contains any putative class allegations.

## III.   THE NATIONAL UNION PRIMARY POLICIES

National Union issued the National Union Primary Policies to National Gypsum Company effective from January 1, 1993 to January 1, 1999. The National Union Primary

Policies provide coverage for "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies" and further provide that "[w]e will have the right and duty to defend any 'suit' seeking those damages." (*See* Section I.1.a. of Ex. B to DE 103.) The National Union Primary Policies also state that "[t]his insurance applies to 'bodily injury' and 'property damage' only if: . . . (2) [t]he 'bodily injury' or 'property damage' occurs during the policy period." (*See* Section I.1.b.(2) of Ex. B to DE 103.)

## IV.    THE COVERAGE CLAIMS

On April 3, 2009, NGC provided first notice of the Brincku claim to National Union under the National Union Umbrella Policy effective November 1, 2008 to November 1, 2009. (Exhibit B.) This was the first notice received by National Union of any drywall-related claim against NGC. On October 6, 2009, NGC provided first notice of a pre-suit claim made by Raymond Yee to the CPSC. The notice identified the claim as the "Lake Havasu, AZ" claim and the date of loss as "09/01/2004 – 10/02/2009." NGC provided notice solely under the National Union Umbrella Policies effective from November 1, 2003 to November 1, 2009. (Ex. B to DE 116 at 2-3, 7.) When Raymond Yee later filed suit against NGC, a notice dated October 26, 2009 was provided to National Union by NGC, which again made no reference to the National Union Primary Policies but rather stated simply that "[t]his is related to the previously reported Lake Havasu AZ matter." (Ex. C to DE 116 at 2.) Additional notices of Drywall Lawsuits were received from December 2009 through May 2010 in which NGC advised that it was seeking coverage under "all applicable policies." (Exhibits C through E.) None of these notices identified the National Union Primary Policies as applicable policies, and the dates at issue in the

Drywall Lawsuits, which were in 2004 and later, did not alert National Union that NGC would claim coverage under the National Union Primary Policies.

On December 16, 2009, NGC filed a lawsuit in North Carolina state court, Mecklenburg County, against its insurers, ACE American Insurance Company ("ACE"), American Guarantee & Liability Insurance Co., Liberty Insurance Underwriters Inc., and National Union. This action was removed to this Court on January 20, 2010. (DE 1.)

In its original complaint, NGC asserted in part that it was entitled to a defense for the Drywall Lawsuits only under primary policies issued by ACE to New NGC, Inc. effective November 1, 2003 to November 1, 2009 and umbrella policies issued by National Union to New NGC, Inc. effective from November 1, 2003 to November 1, 2009 (the "National Union Umbrella Policies"). NGC's complaint did not identify the National Union Primary Policies as applicable policies. National Union filed a motion to dismiss or stay the action in favor of the arbitration agreements in the Pollution Endorsements in the National Union Umbrella Policies. (DE 29-31, 76-77.) NGC ultimately agreed to arbitration.

On June 18, 2010, NGC sought leave to amend its Complaint to add and seek coverage under the National Union Primary Policies. (DE 54.) This was the first time NGC formally asserted a right to coverage under the National Union Primary Policies, or any other policy effective prior to November 2003, for the Drywall Lawsuits. NGC also asserted in its amended complaint that it was entitled to a defense under a policy issued by Lumbermens Mutual Casualty Company effective from November 1, 2000 to November 1, 2001.[3] The Court granted NGC's motion to amend on July 12, 2010. (DE 62.)

Subsequently, on August 23, 2010, National Union filed an answer and counterclaim. (DE 81.) National Union denied that it has any present defense obligations for the Drywall

---

[3] The Court has since granted NGC and Lumbermen's joint motion to dismiss Lumbermens from the action.

Lawsuits. Further, in its counterclaim, National Union sought a declaration that it had no duty to defend or indemnify NGC for the Drywall Lawsuits with respect to the National Union Primary Policies because none of the complaints allege damages within the effective periods of the policies and NGC has no reasonable basis to assert coverage under the National Union Primary Policies. National Union sought an alternative declaration that, to the extent it does have a duty to defend, National Union has no duty to pay defense costs prior to June 18, 2010 when NGC filed its motion to amend the complaint and thus formally tendered the drywall claims under the National Union Primary Policies.

On February 2, 2011, NGC filed a Motion for Partial Summary Judgment (DE 103) asserting that ACE and National Union owe a duty to defend the Drywall Lawsuit captioned *Yee v. National Gypsum Company, et al.*, pending in the United States District Court for the District of Arizona (DE 102 and 103). NGC did not move for summary judgment with respect to any of the other Drywall Lawsuits.[4] By this Cross Motion, National Union respectfully requests that this Court enter an order finding National Union has no duty to defend or indemnify NGC under the National Union Primary Policies with respect to any of the Drywall Lawsuits.

## LEGAL STANDARDS

### I.    SUMMARY JUDGMENT STANDARD

A court must grant a motion for summary judgment if the pleadings, depositions, and affidavits submitted show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). While the movant bears the initial burden of demonstrating that there are no genuine issues of material fact, once that burden has been met, the non-moving party must demonstrate that a genuine issue of material

---

[4] National Union filed its Memorandum in Opposition to NGC's Motion for Partial Summary Judgment on March 14, 2011. (DE 116.)

fact actually exists. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 521 (4th Cir. 2003); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If it appears clearly that the insurer would not be liable under its policy for any judgment on the pleadings, it has no duty to defend. *Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 636 (4th Cir. 2005).

The opposing party cannot meet its burden by merely asserting that an issue exists. *Matsushita Elec.*, 475 U.S. at 586. Rather, the opposing party must "set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e)(2). "Furthermore, neither '[u]nsupported speculation,' [*Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)], nor evidence that is 'merely colorable' or 'not significantly probative,' [*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)], will suffice to defeat a motion for summary judgment." *Bouchat*, 346 F.3d at 521. Rather, summary judgment should be granted where "the adverse party fails to bring forth facts showing that 'reasonable minds could differ' on a material point." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

## II. NORTH CAROLINA LAW GOVERNING THE INTERPRETATION OF LIABILITY INSURANCE POLICIES

Interpretation of an insurance policy is a matter of law and should be decided by the court. *Erie Ins. Exch. v. St. Stephen's Episcopal Church*, 153 N.C. App. 709, 711-12, 570 S.E.2d 763, 765 (2002). The policy language defines the scope and extent of coverage. *North Carolina Farm Bureau Mut. Ins. Co. v. Fowler ex rel. Rudisill*, 162 N.C. App. 100, 103, 589 S.E.2d 911, 913 (2004). "'[I]t is the duty of the court to construe an insurance policy as it is written, not to rewrite it and thus make a new contract for the parties.'" *Trophy Tracks, Inc. v. Mass. Bay Ins. Co.*, 195 N.C. App. 734, 738, 673 S.E.2d 787, 790 (2009) (quoting *Allstate Ins. Co. v. Shelby Mut. Ins. Co.*, 269 N.C. 341, 345, 152 S.E.2d 436, 440 (1967)). Courts must consider insurance

policies in their entirety. It is the duty of the court to "construe all clauses of an insurance policy together" and to "deem all words 'to have been put into the policy for a purpose.'" *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, LLC*, 364 N.C. 1, 9, 692 S.E.2d 605, 612 (2010). Where the language is unambiguous, the policy is interpreted according to its plain meaning. *Eagle Eng'g, Inc. v. Continental Cas. Co.*, 191 N.C. App. 593, 598, 664 S.E.2d 62, 65 (2008). Policy language is ambiguous only if it is susceptible to more than one reasonable interpretation, one creating coverage and one limiting coverage. "A mere disagreement between the parties over the language of the insurance contract does not create an ambiguity." *Id.* (quoting *Pennsylvania Nat'l Mut. Ins. Co. v. Strickland*, 178 N.C. App. 547, 550, 631 S.E.2d 845, 847 (2006)).

## III.     THE DUTY TO DEFEND

When determining whether an insurer has a duty to defend, North Carolina courts apply the "comparison test," which requires "reading the policies and the complaint 'side-by-side . . . to determine whether events as alleged are covered or excluded.'" *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, LLC*, 364 N.C. 1, 6, 692 S.E.2d 605, 610 (2010) (citing *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 693. 340 S.E.2d 374, 377 (1986)). Thus, the insurer's duty to defend is ordinarily determined by the facts as alleged in the pleadings. *Id.* "In addressing the duty to defend, the question is not whether some interpretation of the facts as alleged could possibly bring the injury within the coverage provided by the insurance policy; the question is, assuming the facts as alleged to be true, whether the insurance policy covers that injury." *Id.* at 7, 692 S.E.2d at 611. "[I]f the facts are not even arguably covered by the policy, then the insurer has no duty to defend." *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 692, 340 S.E.2d 374, 378 (1986).

## **ARGUMENT**

National Union does not owe NGC a duty to defend or indemnify NGC in the Drywall Lawsuits. NGC seeks coverage for the Drywall Lawsuits under National Union Primary Policies effective from January 1, 1993 to January 1, 1999, which provide coverage only for "'bodily injury' or 'property damage' that takes place during the policy period." The complaints in the Drywall Lawsuits are devoid of any allegations of any injuries or damages occurring during the effective period of the National Union Primary Policies from January 1, 1993 to January 1, 1999. In fact, the complaints in the Drywall Lawsuits each allege that their damages or injuries began in 2004 or later. The putative class allegations, which do not specify a time period, do not trigger National Union's duty to defend under North Carolina law because the complaints contain no affirmative allegations that raise the potential for coverage during the policy periods.

Moreover, the complaints raise no potential for coverage even when taking into account NGC's position that the putative class definitions, which are not explicitly limited to a particular time period, create a duty to defend. Under North Carolina law, National Union is entitled to rely on the facts outside the complaints when viewed in the light most favorable to the insured. Based upon these facts, the earliest claim against NGC concerning allegedly defective drywall with respect to any suit or pre-suit claim arose out of drywall that was purchased in 2004, well after the last National Union Primary Policy expired in 1999. The CPSC remediation guidelines, which are considered the governmental authority on corrosive drywall remediation, clearly state that drywall installed in homes between 2001 and 2008 is the drywall that is potentially problematic. Accordingly, there is no potential or alleged injury during the policy period, and NGC has no reasonable basis to assert a right to coverage under the National Union Primary Policies. NGC's assertion of coverage under the National Union Primary Policies in effect seeks a determination that every primary policy issued since an insured's inception has a duty to

defend even if there is no allegation or fact that potentially implicates an insurer's policy period. NGC's position is inconsistent with the language of the National Union Primary Policies and North Carolina law and therefore should be rejected.  For these reasons, National Union's motion for summary judgment should be granted.

## I.     NATIONAL UNION HAS NO DUTY TO DEFEND LAWSUITS THAT EXPLICITLY LIMIT THE TIMING OF THE INJURIES TO PERIODS POST-DATING THE EXPIRATION OF THE NATIONAL UNION PRIMARY POLICIES

North Carolina courts follow the well-established rule that "when the pleadings allege facts indicating that the event in question is not covered, and the insurer has no knowledge that the facts are otherwise, then it is not bound to defend."  *Am. Mfrs. Mut. Ins. Co. v. Morgan*, 147 N.C. App. 438, 444, 556 S.E.2d 25, 29 (2001) (quoting *Waste Mgmt. of Carolinas, Inc.*, 315 N.C. 688, 691, 340 S.E.2d at 377).  The National Union Primary Policies provide coverage when "property damage" is caused by an "occurrence" and when the "property damage" occurs during the policy period.  If the pleadings do not state facts demonstrating that "property damage" occurred during the policy periods, National Union has no duty to defend.  *Harleysville Mut. Ins. Co. v. Berkley Ins. Co. of Carolinas*, 169 N.C. App. 556, 563, 610 S.E.2d 215, 219 (2005).

The complaints in each of the suits brought on behalf of individual plaintiffs do not implicate National Union's defense obligations under the National Union Primary Policies.  The individual lawsuits, *Worthington*, *Crespo*, *Downing*, and *Palazzolo*, do not implicate National Union's duty to defend because each of the lawsuits alleges that the plaintiffs moved into their homes in 2006, after the expiration of the National Union Primary Policies in 1999.  (Exs. A through D to DE 81 at ¶ 9.)  Moreover, there is simply no indication on the face of the complaints that periods prior to 2006 are implicated and certainly not periods dating as far back as the National Union Primary Policies effective from January 1, 1993 to January 1, 1999.

The complaint in the *Clark* suit also does not implicate National Union's duty to defend under the National Union Primary Policies. The named defendant in the original *Clark* complaint is National Gypsum Services Company, an entity that did not come into existence until November 17, 1999, after the expiration of the National Union Primary Policies. (See Ex. A.) Moreover, the amended complaint filed in *Clark* on June 23, 2010 also does not implicate the National Union Primary Policies because, even though New NGC, Inc. was added as a defendant, the amended complaint alleges that the plaintiffs' home was constructed "in or about 2007," well after the expiration of the National Union Primary Policies in 1999. (Ex. F to DE 81 at ¶ 10.)

The allegations in the *Cotilla* and *Johnson* class action complaints also do not implicate the National Union Primary Policies' periods. The *Cotilla* complaint and amended complaint each allege that the named plaintiffs' home was built in approximately 2006. (Exs. K and L to DE 81 at ¶¶ 10, 18.) The *Johnson* complaint alleges that the named plaintiffs' home was built in approximately 2005. (Ex. J to DE 81 at ¶¶ 10, 18.) Moreover, both the *Cotilla* and *Johnson* complaints assert that National Gypsum's drywall was used in the construction of homes "*between 2004 and present*," thus limiting the time period in question to drywall installed in 2004 and later and making it irrelevant that the class definition does not repeat this temporal limitation. (Ex. K and L to DE 81 at ¶ 67; Ex. J to DE 81 at ¶ 81 (emphasis added)). *Morgan*, 147 N.C. App. at 444, 556 S.E.2d at 29. In sum, the faces of the complaints in *Cotilla* and *Johnson* clearly establish that there is no potential for injury during the periods of the National Union Primary Policies effective from 1993-1999 and thus no duty to defend.

Accordingly, this Court should hold that National Union has no duty to defend or indemnify NGC for the Drywall Lawsuits brought on behalf of individual plaintiffs in

*Worthington*, *Crespo*, *Downing*, *Palazzolo*, *Clark*, *Cotilla*, and *Johnson*, as well as any other suits that allege "bodily injury" or "property damage" post-dating the policy periods of the National Union Primary Policies.

## II. NATIONAL UNION HAS NO DUTY TO DEFEND THE PUTATIVE CLASS ACTIONS WHERE THE COMPLAINTS DO NOT IMPLICATE THE POLICY PERIODS AND FACTS FAVORABLE TO THE INSURED OUTSIDE OF THE COMPLAINT ESTABLISH THAT THERE IS NO POTENTIAL FOR COVERAGE

NGC also seeks a defense under the National Union Primary Policies for putative class action lawsuits, *Visintin*, *Brincku*, *Yee* and *Brucker*. The National Union Primary Policies provide coverage when "property damage" is caused by an "occurrence" and when the "property damage" occurs during the policy period. The complaints in each of these lawsuits identify named plaintiffs whose homes were constructed well after the expiration of the National Union Primary Policies. Moreover, the complaints are devoid of any allegations of any injuries or damages occurring during the National Union Primary Policies.

NGC's assertion of coverage in the putative class action lawsuits rests on the lack of a temporal limitation in the putative class definitions. However, North Carolina courts recognize that facts construed most favorably to the insured outside of the complaint are relevant to the duty to defend. *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 340 S.E.2d 374 (1986). In *Brincku*, it is clear that there is no duty to defend the amended complaint, which limits the putative class to parties injured by drywall manufactured at NGC's Apollo Beach Plant, which was not in operation until 2001.

Facts also establish that there is no duty to defend any of the other putative class actions. The earliest known cases involving defective corrosive drywall arise from homes constructed in 2001 and later. Indeed, the CPSC, the agency responsible for studying the drywall problem and

preparing remediation protocols, has found that the defective drywall problem involves drywall installed from 2001 to 2008. Accordingly, it cannot be disputed that there is no potential for injury during the National Union Primary Policies' periods and thus there is not duty to defend.

### A. The Complaints Do Not Allege Injury during the Policy Periods

The National Union Primary Policies provide coverage when "property damage" is caused by an "occurrence" and when the "property damage" occurs during the policy period. Thus, the question facing this Court is whether the pleadings state facts demonstrating that "property damage" occurred during the policy period to trigger National Union's duty to defend. *Harleysville Mut. Ins. Co. v. Berkley Ins. Co. of Carolinas*, 169 N.C. App. 556, 562-63 610 S.E.2d 215, 219 (2005). Where a complaint fails to allege injury or damage during the policy period, North Carolina courts hold that the insurer has no duty to defend. *Id.* at 562, 610 S.E.2d at 219 (2005) (finding no duty to defend where there were no allegations that the damage was caused during the policy period); *see also, Frankenmuth Mut. Ins. Co. v. Carolina Phoenix Builders, Inc.*, ___ F. Supp. ___, 2010 WL 520828, at *1, No. Civ.3:09-CV-250-GCM (W.D.N.C. Feb. 9, 2010) ("*[E]ven if the exact date of the injury-in-fact is uncertain*, the insurer has no duty to defend or indemnify the insured if there are no allegations in the complaint of any 'actions or inactions' by the insured during the effective dates of the policy." (emphasis added) (quoting *Harleysville Mut. Ins. Co. v. Berkley Ins. Co. of Carolinas*, 169 N.C. App. at 563, 610 S.E.2d at 219)). *See also Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 636 (4th Cir. 2005) (Virginia law) (finding no duty to defend where the complaint did not allege facts within coverage and no evidence was presented by the insured from which a reasonable jury could find coverage).

The complaints in *Brincku*, *Visintin*, *Yee* and *Brucker* are devoid of any allegations of any injuries or damages occurring during the National Union Primary Policies. Rather, the earliest alleged injury or damage purportedly took place in 2004, well after the expiration of the last National Union Primary Policy in 1999. The *Brincku* suit alleged that the drywall in issue was delivered to the Brincku's residence on April 29, 2004 and August 13, 2004 and that the Garcia's began experiencing problems approximately six months after moving into the home in July 2004. The *Visintin* suit alleged that the drywall in issue was delivered from November 2006 to February 2007.[5] (Ex. G to DE 81 at ¶ 53.) The *Yee* suit alleges that the name plaintiff began renovating his home in 2008 using NGC drywall, which he claims is defective. (Exs. M and N to DE 81 at ¶ 4.) The *Brucker* suit alleges that the name plaintiff purchased the defective drywall on May 26, 2006. (Ex. G at ¶ 35.)

Clearly, there is no indication on the faces of the complaints filed in *Brincku*, *Visintin*, *Yee* or *Brucker* that plaintiffs allege that they sustained "bodily injury" or "property damage" during the effective dates of the National Union Primary Policies from 1993 to 1999, or at any time prior to 2004. *See Harleysville Mut. Ins. Co. v. Berkley Ins. Co. of Carolinas*, 169 N.C. App. 556, 563, 610 S.E.2d 215, 219 (2005) (finding no duty to defend where there were no allegations that the damage was caused during the policy period). Moreover, none of the allegations of any of the putative class action complaints allege any injuries or damages occurring during the National Union Primary Policy periods as required by North Carolina law in order to trigger the duty to defend. *See Hartford Accident and Indemnity Co. v. Beaver*, 466 F.3d 1289 (11th Cir. 2006) (finding only that putative class allegations trigger the duty to defend when the class definition affirmatively alleges injury during the policy period).

---

[5] It is also clear that the second amended complaint in *Brincku* does not create a duty to defend because the putative class allegations are eliminated and the sole remaining allegations, those brought on behalf of the Brinckus, assert that the Brincku's house was not built or occupied until 2004.

**B.    The Lack Of A Temporal Limitation On The Putative Class Definitions Does Not Create A Duty To Defend Where The Facts Outside The Complaint Clearly Establish That There Is No Potential For Coverage**

In *Waste Management*, the Supreme Court of North Carolina held that facts outside of a complaint were relevant to the insurer's duty to defend.  *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 340 S.E.2d 374 (1986).  North Carolina courts construe the holding in *Waste Management* to mean:  "Although the insurer's duty to defend an action is generally determined by the pleadings, facts learned from the insured and facts discoverable by reasonable investigation may also be considered." *Duke Univ. v. St. Pau Fire & Marine Ins. Co.*, 96 N.C. App. 635, 638, 386 S.E.2d 762, 764 (1990) (finding that affidavits filed by plaintiffs in support of its motion were relevant to determining the duty to defend).  *See also Am. Mfrs. Mut. Ins. Co. v. Morgan*, 147 N.C. App. 438, 444, 556 S.E.2d 25, 29 (2001) ("[W]hen the pleadings allege facts indicating that the event in question is not covered, and the insurer has no knowledge that the facts are otherwise, then it is not bound to defend." (quoting *Waste Mgmt. of Carolinas, Inc.*, 315 N.C. at 691, 340 S.E.2d at 377)).

In *Peerless Insurance Co. v. Strother*, 765 F. Supp. 866 (E.D.N.C. 1990), the court addressed the effect of the requirement of injury during the policy period on the duty to defend in an analogous situation.  The court applied a discovery trigger of coverage to alleged environmental injuries and found that the insurer had no duty to defend under policies in effect from 1970 to 1977 because no occurrence was alleged to have occurred during the policy period. *Id.* at 870.  The court reasoned that there was no indication that the contamination was discovered prior to 1984 and that even if the court looked outside the pleadings, the facts most

favorable to the insured established that the contamination was discovered in 1978.[6] *Id.* The court found it "significant" that there was a "complete absence of any evidence or allegation that could possibly support a finding that any party had notice of environmental damage at this site prior to 1978." *Id.*; *see also Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 638 (4th Cir. 2005) (finding no duty to defend where the insured failed to present any evidence that could potentially trigger the insurer's defense obligation); *Waste Mgmt. of Carolinas, Inc.*, 315 N.C. at 692, 340 S.E.2d at 378 ("[I]f the facts are not even arguably covered by the policy, then the insurer has no duty to defend.").

Similarly, in *Morgan*, the insured sought coverage under a Personal Catastrophe Liability ("PCL") Endorsement effective from November 14, 1995 to November 14, 1996 for alleged personal injury to the plaintiff arising from the insured's affair with the plaintiff's husband. The plaintiff sought damages for emotional distress arising out of the torts of criminal conversation and alienation of affection. The court concluded that the policies provided coverage for personal injury, including "mental anguish and mental injury." The insured sought coverage under the policy on the basis that the affair had taken place as early as December 1996, during the period the endorsement was in effect. As the complaint alleged that the plaintiff did not learn of the affair until 1997, after the endorsement expired, and the complaint "provided no basis to determine when the alleged injuries occurred," there was no duty to defend. *Morgan*, 147 N.C. App. at 445, 556 S.E.2d at 30. In so holding, the court implicitly refused to assume injury during the policy period where the complaint was silent as to when the affair began. The trial court held that the insurer had no duty to defend and the appellate court affirmed, finding there was competent evidence to support the trial court's finding that "[the plaintiff's] injuries did not

---

[6] North Carolina courts no longer apply a discovery trigger, but the reasoning of the *Peerless* court—that there was no duty to defend because the underlying complaint was devoid of any allegations to trigger coverage during the policy period—is still applicable.

occur, and that [the plaintiff's] complaint did not allege that her injuries occurred, during the 95-96 PCL Endorsement period." *Id.*

As in *Morgan* and *Peerless*, there is no indication on the face of the complaints that any damage is alleged to have taken place during the National Union Primary Policy period from 1993 to 1999. Moreover, facts outside of the complaints clearly demonstrate that there is no potential for coverage for any of the drywall suits. The amended *Brincku* complaint dated June 24, 2010 defined the putative class as "[a]ll owners of residential homes in Florida containing synthetic drywall manufactured, sold, distributed, or supplied by National Gypsum from its Apollo Beach Plant who have experienced copper sulfide corrosion of HVAC or electrical systems." (Ex. I to DE 81 at ¶ 59.) NGC admits that its Apollo Beach Plant did not even begin operations until 2001. (DE 85 at ¶ 4.) Accordingly, the affirmative allegations in the complaint clearly do not implicate the National Union Primary Policy Periods, and facts outside of the complaint establish that the drywall in issue could not have been manufactured prior to 2001.

NGC asserts that because the putative class definitions in the *Brincku*, *Visintin*, *Yee*, and *Brucker*[7] complaints are not limited to a particular time period, there is a potential for coverage under the National Union Primary Policies. Nonetheless, facts outside of the complaints clearly establish that injury during the policy periods is not possible. Looking past the pleadings, as contemplated by North Carolina Courts, with respect to assertions of both defective Chinese and American problem drywall, the earliest known cases arise from homes constructed in 2001 and later. Indeed, the CPSC, the agency responsible for studying the drywall problem and preparing remediation protocols, has found that the defective drywall problem involves drywall installed

---

[7] As demonstrated in the previous section (Argument Section I.), the *Cotilla* and *Johnson* complaints explicitly limit the time period at issue to 2004 and later. Therefore, it is irrelevant that the putative class definitions are not limited to a particular time period. Nonetheless, the argument here is equally applicable to *Cotilla* and *Johnson* to the extent NGC asserts that there is a potential for coverage in those suits due to the putative class definitions.

from 2001 to 2008. In particular, the CPSC has developed a method for identifying problem drywall and requires, *__as a threshold matter__*, that a visual inspection of the drywall reveal both (1) blackening of wiring or air conditioning coils and (2) "[t]he installation of new drywall (for new construction or renovations) *__between 2001 and 2008__*."[8] (Ex. A to DE 116 at 2.) The *Yee* complaint even relies on the CPSC and notes that the CPSC has been investigating and studying allegedly defective American drywall. (Ex. N to DE 81 at ¶ 15.)

NGC's omission of the National Union Primary Policies from notices sent to National Union prior to June 18, 2010 (the date the NGC sought leave to amend its complaint) further demonstrates the lack of allegations implicating the 1993 to 1999 periods of the National Union Primary Policies. In fact, NGC provided notice of its first drywall claim (Brincku) by letter dated April 3, 2009 (Ex. B) under one National Union umbrella policy effective from November 1, 2008 to November 1, 2009, expanded the coverage sought to the National Union Umbrella Policies effective November 1, 2003 to November 1, 2009 as early as October 2009 (Ex. B to DE 116 at 2-3, 5), and provided multiple other notices from December 2009 to May 2010, none of which sought coverage under the National Union Primary Policies. NGC did not seek a defense of the Drywall Lawsuits under the National Union Primary Policies until June 18, 2010 when it sought leave to amend its complaint in this action, and only after it had failed to obtain a defense from its primary carrier for the 2003 to 2009 period.

Finally, by asserting coverage under the National Union Primary Policies, NGC seeks coverage under every primary liability policy issued to it since New NGC, Inc. incepted in 1993 following the bankruptcy proceedings of National Gypsum Company. (DE 103 at 6.) A ruling that NGC is entitled to a defense under the National Union Primary Policies would be tantamount to requiring every liability policy issued to a company since its inception to defend if

---

[8] The CPSC specifically stated that these guidelines are not limited to Chinese drywall.

putative class allegations do not specify a particular time period in issue, even when there is no indication on the face of the complaint or otherwise that there are any allegations of injury during the policy period. This is neither the law of North Carolina, nor a reasonable extension of existing precedent. *See Harleysville Mut. Ins. Co. v. Berkley Ins. Co. of Carolinas*, 169 N.C. App. 556, 562, 610 S.E.2d 215, 219 (2005) (allegations of damage during the policy period trigger the duty to defend).

In sum, when the facts most favorable to NGC with respect to *any suit or pre-suit claim* are considered, there is a "*complete absence of any evidence or allegation*" that could possibly support a finding that "bodily injury" or "property damage" occurred prior to 2004. *Peerless Insurance Co.*, 765 F. Supp. at 870 (emphasis added). It is indisputable that the underlying complaints fail to allege, or raise the potential of, "bodily injury" or "property damage" during the effective periods of the National Union Primary Policies from January 1, 1993 to January 1, 1999. Therefore, the National Union Primary Policies are not obligated, as a matter of law, to respond to the Drywall Lawsuits and National Union's Cross Motion for Summary Judgment should be granted.

## III. ALTERNATIVELY, NATIONAL UNION'S DEFENSE OBLIGATION, IF ANY, WOULD NOT INCEPT UNTIL TENDER

If this Court refuses to grant National Union's Cross Motion for Summary Judgment, which, respectfully, it should not, National Union alternatively requests that this Court grant summary judgment in its favor that NGC is not entitled to reimbursement for defense costs incurred prior to June 18, 2010, the date NGC sought leave to amend its complaint in this action to seek coverage under the National Union Primary Policies. North Carolina courts recognize that the duty to pay defense costs extends only to those costs incurred after the insured tenders the claim to its insurer. *Wm. C. Vick Constr. Co. v. Penn. Nat'l Mut. Cas. Ins. Co.*, 52 F. Supp.

2d 569 (E.D.N.C. 1999) (stating that the insurer would not have a duty to pay pre-tender defense costs because the policy did not explicitly require it and an insurer should not be obligated to pay costs it had no opportunity to control).

NGC did not tender the Drywall Lawsuits or any pre-suit claim related to defective drywall under the National Union Primary Policies or any other policy in effect prior to November 2003 before it sought leave to amend its complaint in this action on June 18, 2010. The first notice NGC provided to National Union regarding any defective drywall claim (Brincku) was dated April 3, 2009. The notice identified the date of loss as January 19, 2009 and solely identified one National Union Umbrella Policy, effect from November 1, 2008 to November 1, 2009. (Ex. B.) When NGC provided first notice of the Yee claim (which at the time was known as the "Lake Havasu, AZ" claim) on October 6, 2009, NGC identified the date of loss as "09/01/2004 – 10/02/2009" and provided notice under National Union Umbrella Policies in effect from November 1, 2003 to November 1, 2009. (Ex. B to DE 116 at 2-3, 7.) When Raymond Yee later filed suit against NGC, the notice of the *Yee* suit to National Union on October 26, 2009 again made no reference to the National Union Primary Policies but rather stated simply that "[t]his is related to the previously reported Lake Havasu AZ matter." (Ex. C to DE 116 at 2.) Furthermore, later notices of loss of other Drywall Lawsuits and claims, dated from December 2009 to May 2010, did not identify the National Union Primary Policies and simply made reference to "all applicable policies." (Exs. C through E.) In fact, NGC's motion for leave to amend its complaint dated June 18, 2010 was the first time NGC formally sought coverage for the Drywall Lawsuits under the National Union Primary Policies. Accordingly, any defense costs incurred prior to June 18, 2010 are pre-tender costs and National Union should not be obligated to reimburse NGC for such costs.

Thus, in accordance with North Carolina law as recognized in *WM. C. Vick Constr. Co.*, if this Court refuses to grant National Union's cross motion for summary judgment, which it should not, National Union requests that this Court enter an alternative judgment that National Union is not obligated to pay any defense costs incurred in the defense of the Drywall Lawsuits prior to June 18, 2010, the date NGC sought coverage under the National Union Primary Policies.

## CONCLUSION

The National Union Primary Policies have no duty to defend because the Drywall Lawsuits do not allege, or raise the potential of, "bodily injury" or "property damage" during the policy periods in effect from January 1, 1993 to January 1, 1999. The lawsuits brought on behalf of individuals, *Worthington*, *Crespo*, *Downing*, *Palazzolo*, and *Clark*, as well as the class action complaints in *Cotilla*, and *Johnson*, affirmatively limit the time period in question to 2004 and later. Moreover, the lack of a temporal limitation in the putative class action complaints in *Brincku*, *Visintin*, *Yee* and *Brucker* does not create a duty to defend. Rather, the facts most favorable to the insured outside of the complaints clearly show that there is no potential of any injury or damage prior to 2001, after the last National Union Primary Policy expired in 1999. Therefore, it is indisputable that National Union is entitled to judgment as a matter of law that it has no duty to defend or indemnify NGC pursuant to the National Union Primary Policies. Alternatively, if the Court refuses to grant summary judgment in favor of National Union, which it should not, National Union is entitled to a judgment that it is not obligated to reimburse NGC for any defense costs incurred in the Drywall Lawsuits prior to June 18, 2010, the date of tender under the National Union Primary Policies.

This the 19th day of May, 2011.

Respectfully submitted,

Joseph A. Hinkhouse
Sara Uffelman Gattie
HINKHOUSE WILLIAMS WALSH LLP
180 North Stetson, Suite 3400
Chicago, Illinois 60601
Telephone:     (312) 784-5400
Facsimile:     (312) 784-5499
Email: jhinkhouse@hww-law.com
       sgattie@hww-law.com

/s/ Susan K. Burkhart
State Bar No. 10151
CRANFILL, SUMNER & HARTZOG, L.L.P.
P.O. Box 27808
Raleigh, North Carolina 27611
Phone: (919) 828-5100
Fax: (919) 828-2277
Email: skb@cshlaw.com
LR 83.1 Counsel

**ATTORNEYS FOR NATIONAL UNION FIRE
INSURANCE COMPANY OF PITTSBURGH,
PA**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTIO NO. 3:10-CV-00022

| | | |
|---|---|---|
| NEW NGC, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CERTIFICATE OF SERVICE** |
| | ) | |
| ACE AMERICAN INSURANCE | ) | |
| COMPANY, LIBERTY INSURANCE | ) | |
| UNDERWRITERS, INC., and | ) | |
| NATIONAL UNION FIRE INSURANCE | ) | |
| COMPANY OF PITTSBURGH, PA, | ) | |
| LUMBERMENS MUTUAL CASUALTY | ) | |
| COMPANY, | ) | |
| Defendants. | ) | |

     I hereby certify that on May 19, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF, which will send notification of such filing to the following:

| | | |
|---|---|---|
| Mr. R. Steven DeGeorge, Esq.<br>sdegeorge@rbh.com | Ms. Kimberly Sullivan, Esq.<br>ksullivan@cozen.com | Mr. Hatcher B. Kincheloe, Esq.<br>hkincheloe@hedrickgardner.com |
| Mr. Michel Y. Horton, Esq.<br>mhorton@morganlewis.com | Mr. Joseph A. Ziemianski, Esq.<br>jziemianski@cozen.com | Mr. Paul A. Zevnik, Esq.<br>pzevnik@morganlewis.com |
| Mr. David S. Cox, Esq.<br>dcox@morganlewis.com | Ms. Andrea Cortland, Esq.<br>acortland@cozen.com | Ms. Janice L. Kopec<br>jkopec@morganlewis.com |
| Ms. Jennifer M. Kennedy, Esq.<br>Jennifer.kennedy@morganlewis.com | Mr. Stephen Berry, Esq.<br>sberry@mckennalong.com | Mr. Jim Bryant, Esq.<br>jbryan@nexsenpruet.com |

/s/ SUSAN K. BURKHART
State Bar No. 10151
Attorneys Defendant
CRANFILL SUMNER & HARTZOG LLP
Post Office Box 27808
Raleigh, North Carolina  27611-7808
Telephone:    (919) 828-5100
Fax:          (919) 828-2277
Email:  skb@cshlaw.com
L.R. 83.1 Counsel