# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CASE NO. 3:10-cv-00022-RLV-DSC

NEW NGC, INC.,          )
                                 )
      Plaintiff,         )
                                 )
      v.               )      **MEMORANDUM AND ORDER**
                                 )
ACE AMERICAN INSURANCE )
CO., AMERICAN GUARANTEE )
& LIABILITY INSURANCE CO. )
LIBERTY INSURANCE      )
UNDERWRITERS, NATIONAL )
UNION FIRE INSURANCE CO. )
OF PITTSBURGH, PA,       )
LUMBERMENS MUTUAL     )
CASUALTY CO.           )
                                 )
      Defendants.     )
_____)
                                 )
NATIONAL UNION FIRE     )
INSURANCE CO. OF         )
PITTSBURGH, PA          )
                                 )
      Counter-Claimant  )
                                 )
      v.               )
                                 )
NEW NGC, Inc.          )
                                 )
      Counter-Defendant )
_____)

      **BEFORE THE COURT** are cross-motions for partial summary judgment (Docs. 102,

125) filed by Plaintiff New NGC, Inc. ("NGC"), and Defendant National Union Fire Insurance

Co. of Pittsburgh, PA ("National Union") on February 2, 2011, and May 19, 2011, respectively;

Defendant National Union's Renewed Motion to Dismiss, or Alternatively, Stay Proceedings

(Doc. 76) filed on August 23, 2011; and Defendant ACE American Insurance Co.'s ("ACE's")

Partial Motion to Dismiss, or in the Alternative Stay Proceedings (Doc. 78) filed on August 23, 2011. Also before the Court is Plaintiff's Motion for Pretrial Conference. (Doc. 141).

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). In a diversity case, a district court will apply the conflict of laws rules of the forum state. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). North Carolina statutory law specifies that any policy insuring interests in North Carolina "shall be deemed" to have been made in and subject to the laws of North Carolina. N.C. Gen. Stat. § 58-3-1; *see also Fortune Ins. Co. v. Owens*, 512 S.E.2d 487, 489 (N.C. Ct. App. 1999) *aff'd* 526 S.E.2d 463 (N.C. 2000). Therefore, North Carolina insurance law and contract interpretation principles will be applied to the present matter.

# I. PROCEDURAL HISTORY

On January 20, 2010, all Defendants consented to ACE's removal of *New NGC, Inc. v. ACE American Insurance Co.*, No. 09-29981 (N.C. Super. Ct., filed Dec. 16, 2009) from the Superior Court of Mecklenburg County to federal court. (Doc. 1). Following the submission of several motions to dismiss, Plaintiff NGC filed its Amended Complaint against Defendants ACE and National Union, as well as American Guaranty & Liability Insurance Co. ("AGLI"), Liberty Insurance Underwriters, Inc. ("Liberty"), and Lumbermens Mutual Casualty Co. ("Lumbermens"). (Doc. 64). AGLI, Liberty, and Lumbermens are no longer parties to this lawsuit. (Docs. 101, 120, 124).

# II. FACTUAL BACKGROUND

NGC operates a fully integrated building products manufacturing business from its headquarters in Charlotte, North Carolina. (Doc. 64, at 3). In this business, NGC has become one of the leading producers of domestically manufactured drywall in this country. (*Id.*). ACE

and National Union (collectively "Defendants") are insurance companies that issued commercial general liability insurance policies covering NGC's liabilities arising from their business. (*Id.*). The policy types and coverage periods provided by the Defendants are reproduced below.

**Insurance Policies Issued by ACE**

| Policy Number | Policy Period | Type |
|---|---|---|
| G21694770 | 11/1/2003 – 11/1/2004 | Primary |
| G21708227 | 11/1/2004 – 11/1/2005 | Primary |
| G20587623 | 11/1/2005 – 11/1/2006 | Primary |
| HDOG21733027 | 11/1/2006 – 11/1/2007 | Primary |
| HDOG23735131 | 11/1/2007 – 11/1/2008 | Primary |
| HDO G23746773 | 11/1/2008 – 11/1/2009 | Primary |
| HDO G23746773 | 11/1/2009 – 11/1/2010 | Primary |
| XSLG20587398 | 11/1/2002 – 11/1/2003 | Excess |
| G23789504 | 11/1/2006 – 11/1/2007 | Excess |
| G23887423 | 11/1/2007 – 11/1/2008 | Excess |
| G24638170 | 11/1/2008 – 11/1/2009 | Excess |

(Doc. 64 at 4.)

**Insurance Policies Issued by National Union**

| Policy Number | Policy Period | Type |
|---|---|---|
| RMGL 143-67-67 | 1/1/1993 – 1/1/1994 | Primary |
| RMGL 143-67-68 | 1/1/1993 – 1/1/1994 | Primary |
| RMGL 139-52-49 | 1/1/1994 – 1/1/1995 | Primary |
| RMGL 139-52-50 | 1/1/1994 – 1/1/1995 | Primary |
| RMGL 139-99-60 | 1/1/1995 – 1/1/1996 | Primary |
| RMGL 121-52-86 | 1/1/1996 – 1/1/1997 | Primary |
| RMGL 143-80-57 | 1/1/1997 – 1/1/1998 | Primary |
| RMGL 113-56-58 | 1/1/1998 – 1/1/1999 | Primary |
| BE297783 | 11/1/2003 – 11/1/2004 | Umbrella |
| BE2978279 | 11/1/2004 – 11/1/2005 | Umbrella |
| BE4484996 | 11/1/2005 – 11/1/2006 | Umbrella |
| 4485755 | 11/1/2006 – 11/1/2007 | Umbrella |
| 9835294 | 11/1/2007 – 11/1/2008 | Umbrella |
| 2227033 | 11/1/2008 – 11/1/2009 | Umbrella |

(*Id.*)

In 2009, at the outset of this suit, NGC faced a flurry of individual and putative class action lawsuits (the "Drywall Lawsuits") alleging wrongdoing by NGC. [1] (*Id.* at 6-7). The Drywall Lawsuits asserted injuries and damages arising from exposure to what was alleged to be defective drywall manufactured, sold, used, or distributed by NGC. The Drywall Lawsuits alleged property damage in the form of, *inter alia*, the corrosion of metal pipes and electrical wiring, deterioration of air condition coils, and melting of insulation, as well as bodily injury in the form of respiratory ailments and allergy-like symptoms. (*Id.*). The Drywall Lawsuits were filed against NGC on the heels of thousands of claims by American property owners alleging identical defects, injuries, and damages stemming from drywall products imported from China. (Doc. 103, at 1); (Doc. 126, at 3.)

Defendants have maintained a position of non-coverage relieving them of any duty to defend NGC against the Drywall Lawsuits. NGC argues that the Drywall Lawsuits are covered by Defendants' insurance policies and that it timely tendered the Drywall Lawsuits and otherwise complied with all material obligations as an insured party to the policies.

In this suit, NGC alleges breach of contract by Defendants for failure to comply with their respective insurance policies. (Doc. 64, at 8-9). NGC also requests judgment pursuant to 28 U.S.C. § 2201, declaring the rights and legal obligations of NGC and a determination that Defendants are jointly and severally obligated to pay in full NGC's legal liabilities, costs, and expenses for the investigation and defense of the Drywall Lawsuits. (*Id.* at 9-12).

---

[1] In a motion for pretrial conference filed September 6, 2013, NGC stated that it had completely and successfully defended itself against the Drywall Lawsuits. (Doc. 141, at 2, ¶ 10). Each of the underlying lawsuits has been dismissed and NGC did not make any settlement payments. *Id.* Therefore, where NGC initially sought a declaration of a present duty to defend by Defendants, now NGC requests that Defendants reimburse NGC's defense costs. (Doc. 141, at 2).

## III. DEFENDANTS' MOTIONS TO DISMISS, OR ALTERNATIVELY, STAY PROCEEDINGS

Defendants move to dismiss, or alternatively, stay these proceedings pursuant to Federal Rule of Civil Procedure 12(b)(1) and 9 U.S.C. § 3, on the basis that the subject of this dispute is governed by mandatory and enforceable arbitration agreements. (Doc. 30, at 1); (Doc. 36, at 1). At issue are the National Union umbrella policies[2] and ACE excess policies[3] issued to NGC. Each of the six National Union umbrella policies contains an endorsement excluding coverage for damages resulting from "[p]ollutants" (Doc. 30 at 5-7), and in the event of disagreement as to the interpretation of the pollution exclusion, the National Union umbrella policies mandate resolution by arbitration.[4] Additionally, any coverage under the three ACE excess policies first requires exhaustion of the underlying National Union umbrella policies. Therefore, coverage by the ACE excess policies is dependent upon resolution of the Pollution Exclusion dispute in connection to the National Union umbrella policies. (Doc. 36).

The Federal Arbitration Act ("FAA") provides that a written agreement to arbitrate in a contract "'shall be valid, irrevocable, and enforceable . . . .'" *Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc.*, 380 F.3d 200, 204 (4th Cir. 2004) (quoting 9 U.S.C. § 1 *et seq.*). The FAA thus requires arbitration of "any issue referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3. Federal courts have a strong policy of favoring arbitration clauses and enforcing them. *See Patten Grading & Paving, Inc.*, 380 F.3d at 204 ("As a result of

---

[2] From the National Union Insurance Policy Chart (*Supra* at 3), policy numbers: BE297783; BE2978279; BE4484996; 4485755; 9835294; 2227033. The period of coverage spans from November 1, 2003 to November 1, 2009.

[3] From the ACE Insurance Policy Table (*Supra* at 3), policy numbers: G23689504; G23887423; G24638170. The period of coverage spans from November 1, 2006 to November 1, 2009.
[4] It is clear from the filings of the parties that interpretation of the pollution exclusion is a primary dispute between NGC and National Union.

this federal policy favoring arbitration, 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.'") (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).

The Court finds, and NGC concedes (Doc. 53, at 5), that the parties' disagreement as to the interpretation of the pollution exclusion contained within the National Union umbrella policies, thereby implicating the ACE excess policies, is subject to mandatory and enforceable arbitration. However, the Court finds that dismissal pursuant to FRCP 12(b)(1) is improper because NGC's claim for defense costs from National Union and ACE under the *primary* policies is not subject to arbitration and must be adjudicated by this Court.

The next issue to be determined is whether the entire case should be stayed pending arbitration of the umbrella and excess policies or whether the case should proceed regarding the primary policies. "[S]ection 3 provides the right to a stay only on an issue 'referable to arbitration under an agreement in writing for such arbitration.'" *Summer Rain v. Donning Co./Publisher's Inc.*, 964 F.2d 1455, 1459-60 (4th Cir. 1992) (quoting 9 U.S.C. § 3). "[A]rbitrability is to be determined on an issue-by-issue basis, without regard to the way that the issues are grouped into claims." *Id.* at 1461. "The decision whether to stay the litigation of non-arbitrable issues is a matter largely within the district court's discretion to control its docket." *Id.* The Court determines that a complete stay of the litigation is not warranted. The nature and scope of the duty to defend between a primary insurer and an insured should not be impeded by collateral clauses contained in umbrella and excess policies. Secondly, the determination of whether a duty to defend exists in the primary policies is not necessarily determinative of

arbitrable issues.  Accordingly, the Court will stay all claims as they relate to the excess and

umbrella policies but shall proceed with regard to the primary policies.

## IV.    CROSS-MOTIONS FOR SUMMARY JUDGMENT

NGC seeks partial summary judgment against the Defendants on the basis that

Defendants breached their contractual duty to defend NGC against the Drywall Lawsuits.[5]

National Union requests summary judgment in its favor on the basis that it has no duty to defend

or indemnify NGC under the National Union primary policies in connection with the Drywall

Lawsuits, or, alternatively, National Union has no obligation to pay any defense costs incurred

prior to June 18, 2010.  Resolution of these motions will be conducted in accordance with the

law discussed below.

### A.    Standard of Review

A court must grant a motion for summary judgment if the pleadings, depositions, and

affidavits submitted show that there is no genuine issue as to any material fact and the moving

party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  While the movant bears

the initial burden of demonstrating that there are no genuine issues of material fact, once that

burden has been met, the non-moving party must demonstrate that a genuine issue of material

fact actually exists. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 521 (4th

---

[5] This Court's review of NGC's Motion for Partial Summary Judgment is limited to the facts and law
applicable to the *Yee* suit. NGC's motion states: "[s]pecifically, NGC seeks partial summary judgment
that ACE and National Union breached their contractual duty to defend NGC in *certain* underlying
product liability litigation." (Doc. 102 at 1) (emphasis added).  NGC's brief in support of this motion
specifies that partial summary judgment is sought in relation to the putative national class action, *Yee, et
al. v. National Gypsum Company, et al.*, United States District Court for the District of Arizona, Case No.
3:09-CV-08189. (Doc. 103, at 2). NGC explains in a footnote that it believes "an adjudication of its
carriers' obligation to defend *Yee* will serve as a bellwether with respect to their obligation to defend the
remaining drywall suits that have been asserted against NGC." *Id.*

Cir. 2003); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In this case, the parties have filed cross-motions for summary judgment. Therefore, this Court must review each motion separately to determine whether either of the parties deserves judgment as a matter of law. Fed. R. Civ. P. 56(c); *Rossignol v. Voorhaar*, 316 F.3d 516 (4th Cir.2003) (*quoting Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62, n.4 (1st Cir. 1997)). When considering each individual motion, the court must take care to "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the party opposing the motion. *Id.* (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)). Summary judgment is appropriate in this case because the question of whether Defendants had a duty to defend is question of law determined by interpretation and application of the language of the policies. *Erie Ins. Exch. v. St. Stephen's Episcopal Church*, 570 S.E.2d 763, 765 (N.C. Ct. App. 2002).

### B. Interpreting Insurance Contracts

The meaning of the language used in an insurance policy is a question of law and the rules for determining the meaning "have long been established." *Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.*, 172 S.E.2d 518, 522 (N.C. 1970) (citations omitted). An insurance policy is considered a contract and North Carolina adheres to the plain meaning rule. If the policy language is clear, courts are duty-bound to interpret it accordingly "'without rewriting the contract or disregarding the express language used . . . The duty is a solemn one, for it seeks to preserve the fundamental right of freedom of contract.'" *Rouse v. Williams Realty Bldg. Co., Inc.*, 544 S.E.2d 609, 612 (N.C. Ct. App. 2001) (quoting *Kruger v. State Farm Mut. Auto Ins. Co.*, 403 S.E.2d 571, 572 (N.C. App. 1991); *see also Allstate Ins. Co. v. Shelby Mut. Ins. Co.*, 152 S.E.2d 436, 440 (N.C. 1967). A corollary of this rule is that defined terms must be given their defined meaning "unless the context clearly requires otherwise." *Westchester Fire Ins. Co.*,

172 S.E.2d at 522.  Undefined and nontechnical terms "are to be given a meaning consistent with the sense in which they are used in ordinary speech, unless the context clearly requires otherwise."  *Id.*  When such a term "has more than one meaning in its ordinary usage . . . it is to be given the meaning most favorable to the [insured]" because the insurer selected the word for use.  *Id.*  Where the meaning of a word is not clearly indicated by the context in which it is used, "resort may be had to other portions of the policy and all clauses of it are to be construed, if possible so as to bring them into harmony."  *Id.*  "Each word is deemed to have been put into the policy for a purpose" and is to be given effect, if possible, by any reasonable construction.  *Id.*

"An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations."  *Schenkel & Shultz, Inc. v. Hermon F. Fox & Associates, P.C.*, 658 S.E.2d 918, 921 (N.C. 2008) (quoting *Register v. White*, 599 S.E.2d 549, 553 (N.C. 2004)).  North Carolina courts construe ambiguous terms and phrases in favor of the insured.  *Id.*  Specifically, coverage provisions are liberally construed and exclusions are strictly construed.  *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.*, 692 S.E.2d 605, 612 (N.C. 2010).

C.    Duty to Defend

A duty to defend exists if the policy so provides.  *Brown v. Lumbermens Mut. Cas. Co.*, 390 S.E.2d 150, 152 (N.C. 1990).  North Carolina uses the "comparison test" to determine whether an insurer is required to defend its insured.  Under this test, the policy and the complaint are read side-by-side to decide whether the events as alleged are covered or excluded.  *Buzz Off*, 692 S.E.2d at 610.  It is axiomatic that the duty to defend is broader than the duty to indemnify.  The duty to defend is measured by the facts as alleged in the pleadings while the duty to indemnify is measured by the facts ultimately determined at trial.  *Waste Mgmt. of Carolinas,*

*Inc. v. Peerless Ins. Co.*, 340 S.E.2d 374, 377 (N.C. 1986). Where the pleadings contain both covered and excluded events the insurer has a duty to defend. *Id.* Further, an insurer still has a duty to defend the insured against groundless, false, or fraudulent allegations. *Id.* at 378. Even where the third-party complaint alleges facts that appear to be outside the insurance coverage, the insurer has a duty to defend if it knows or could reasonably ascertain facts that, if proven, would be covered by its policy. *Id.* at 377. Only where the pleadings allege facts that are not even arguably covered by the policy is the insurer relieved of the duty to defend. *Id.* at 378.

## V.     ANALYSIS

Four issues have emerged in the documents submitted by the parties, disposition of which will resolve the cross-motions for summary judgment before this Court. ACE disclaims any duty to defend NGC arguing that Pollution Exclusions contained in their policies exclude coverage. In addition to the Pollution Exclusion argument, ACE claims that NGC has failed to exhaust required self-insured retention amounts that are a prerequisite to coverage by ACE. National Union disclaims any duty to defend NGC arguing that the claims of the Drywall Lawsuits post-date National Union's primary policy period of coverage. Additionally, National Union argues that it is not liable for any defense costs incurred prior to June 18, 2010, the date they claim NGC tendered notice of the Drywall Lawsuits.

### A.     Summary Judgment Arguments Related to ACE

#### 1.     Application of the Pollution Exclusion

North Carolina law determines an insurer's duty to defend by application of the "comparison test." *Buzz Off,* 692 S.E.2d at 612. A side-by-side placement of the insurance policy and the allegations contained in the underlying complaint, which are presumed to be true,

leads to the conclusion that ACE did have a duty to defend NGC against the Drywall Lawsuits.

The ACE policy and *Yee* complaint are reproduced below:

| ACE Coverage Grant: | Corresponding Yee Allegation: |
|---|---|
| "Agrees to pay those sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies. We have the right and duty to defend any suit seeking those damages." | The Yee complaint alleges that NGC's drywall is defective and that it caused: |
| "bodily injury" | "dangerous health consequences, including respiratory problems, sinus problems, eye irritation and nose bleeds" |
| Or "property damage" | "Damage to home structure and mechanical systems, such as, copper piping, refrigeration coils, A-C coils, and electrical wiring, as well as personal and other property such as personal electronics, appliances, and jewelry." |
| "suit seeking those damages." | "Repairing the damage caused by NGC's defective conduct will cost homeowner's throughout the US millions of dollars. " |

The *Yee* complaint is congruent with the insurance coverage provided by ACE. However, ACE argues that claims contained in the *Yee* suit are excluded from coverage by the pollution exclusion contained in ACE's insurance policies. The *Yee* complaint alleges that defective drywall produced by NGC emits, among other things, high levels of sulfur into the air inside the homes that creates a noxious odor, destroys the home structure and mechanical systems and personal property therein, and causes potentially dangerous health consequences to the eyes and respiratory system. (Doc. 81-14).

The pollution exclusion provides:

This insurance does not apply to any injury, damage, expense, cost, loss, liability or legal obligation arising out of or in any way related to pollution, however caused.

*Pollution* includes the actual, alleged or potential presence in or introduction into the environment of any substance if such substance has, or is alleged to have, the effect of making the environment impure, harmful, or dangerous. *Environment* includes any air, land, structure or the air therein, watercourse or water, including underground water.

We shall have no duty to defend any suit arising out of or in any way related to pollution.

(Doc. 103-4, at 37) (emphasis added).

ACE asserts that the language of the exclusion is unambiguous and must be given its plain and ordinary meaning. ACE argues that injuries and damages alleged in the *Yee* complaint clearly fall within the pollution exclusion because: (1) released sulfur qualifies as *pollution* because it is a substance that makes the environment impure, harmful, or dangerous; (2) the air of the home qualifies as the *environment* because it is the air of a structure; and, (3) the injuries and damages alleged in the Drywall Lawsuits against NGC were caused by this *pollution of the environment*.

NGC argues that defining pollution in such a broad manner is impermissible and that the pollution exclusion only operates to exclude coverage of what are understood to be traditional environmental pollution claims. Further, NGC asserts that the terms of the exclusion are ambiguous and require a pro-insured and pro-coverage construction by the Court that result in coverage under ACE policies.

The pollution exclusion has taken several forms since its inception in the late sixties. Martha A. Kersey, *Exclusions Under Coverage A of a Standard CGL Policy*, *in* 3-18 *Appleman on Insurance Law & Practice, Commercial Gen. Liability Ins.* § 18.03[6] (Matthew Bender &

Co., Inc., 2015). At first insurers used what can be referred to as the "sudden and accidental" exclusion. *Id.* Considerable amounts of litigation resulted over the interpretation of this exclusion and ultimately insurers drafted what has been known as the "absolute" pollution exclusion. *Id.* The instant litigation appears to involve a newer form of the pollution exclusion.

NGC relies upon *West American Ins. Co. v. Tufco Flooring East, Inc.,* 409 S.E.2d 692 (N.C. Ct. App. 1991), *overruled in part by Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co.*, 524 S.E.2d 558 (N.C. 2000) and *Auto-Owners Ins. Co. v. Potter*, 105 Fed. App'x 484 (4th Cir. July 27, 2004) (unpublished) to support its argument that coverage exists. More particularly, NGC argues that the Court should not construe the exclusion to apply to matters that fall within its "core business" and that the clause should be interpreted to cover only prototypical environmental pollution. ACE relies on two opinions written by Judge Britt of the Eastern District, *Whiteville Oil Co., Inc. v. Federal Mutual Ins. Co.*, 889 F. Supp. 241 (E.D.N.C. 1995) and *Penn. Nat'l Mutual Casualty Ins. Co., v. Triangle Paving, Inc.,* 973 F. Supp. 560 (E.D.N.C. 1996) to support its argument that pollution exclusion bars coverage.

In *Tufco*, the North Carolina Court of Appeals, in an opinion authored by Judge Wynn (now of the Fourth Circuit), held that "four independent grounds" supported its conclusion that an insurer's pollution exclusion provision did not bar coverage. 409 S.E.2d at 695. The insured, Tufco, was engaged in the floor resurfacing business. *Id.* at 693. At a job, fumes or vapors from its resurfacing products came into contact with chicken in a cooler. *Id.* NGC's arguments relate to the second, third, and fourth holdings.

Specifically, in the second holding, the Court of Appeals found that the exclusion at issue was ambiguous because of the "interrelationship between the completed operations coverage and

the pollution exclusion clause." *Id.* at 697.[6]  Accordingly, the ambiguity was resolved against

the insurer and the policy was "construed as a reasonable person in the position of the insured

would have understood it to be." *Id.* at 697.  The finding of an ambiguity was a predicate to

engaging in determining what exactly a reasonable insured would understand. *Id.*; *Auto-Owners*,

105 Fed. App'x at 491-92 (refusing to apply "central business activity" coverage where policy

was not ambiguous); *Fed. Ins. Co. v. Southern Lithoplate, Inc.*, 7 F. Supp. 3d 579, 587 n. 5

(E.D.N.C. 2014) (stating that Fourth Circuit has interpreted *Tufco* narrowly).  After finding an

ambiguity, the Court of Appeals stated that "[t]o allow [the insurer] to deny coverage for claims

arising out of Tufco's central business activity would render the policy virtually useless to

Tufco." *Id.*

The third holding of *Tufco* was that, *under the terms of the pertinent exclusion*, the raw

material brought to the jobsite did not qualify as a "pollutant." *Id.* at 698.  The Court of Appeals

analyzed the term "pollutant" which was defined as "irritant or contaminant" in the context of

the surrounding subparagraphs, which referred to waste material.  *Id.*  Given the juxtaposition to

waste and the fact that the dictionary indicated that it was something impure or unwanted, the

Court held that the resurfacing material did not qualify as a pollutant "brought on or to the site."

*Id.*

The fourth holding of *Tufco* was that "the pollution exclusion applies only to discharges

into the environment." *Id.* at 699.  The Court of Appeals found that "both the historical purpose

underlying the pollution exclusion and operative policy terms indicate that a discharge into the

environment is necessary for the clause to be applicable." *Id.*  The Court of Appeals summarized

---

[6] A later Court of Appeals opinion appears to have rejected the contention that an exclusion is inherently ambiguous because it conflicts with what the insured reasonably believed would be covered under the definition of occurrence in the insuring agreement.  *Compare Deason v. J. King Harrison Co., Inc.*, 491 S.E.2d 666, 668 (N.C. Ct. App. 1997) *with* 491 S.E.2d at 669 (Wynn, J., dissenting).

the history of the pollution exclusion by noting that the "sudden and accidental" pollution exclusion applied "only to discharges of pollutants 'into or upon land, the atmosphere or any water course or body of water.'" *Id.* (quoting *Waste Management of Carolinas, Inc. v. Peerless Ins. Co.*, 340 S.E.2d 374, 379 (N.C. 1986)). Prior Supreme Court precedent interpreting the "sudden and accidental" exclusion recognized that the "practical reason for the pollution exclusion is to avoid 'the yawning extent of potential liability arising from the gradual or repeated discharge of hazardous substances *into the environment*." *Id.* (quoting *Peerless*, 340 S.E.2d at 381). In 1985, the "absolute" pollution exclusion was drafted. *Id.* The Court of Appeals had an annotated form of the policy before it that stated that "the amendment to the pollution exclusion was intended . . . to exclude governmental clean up costs from coverage." *Id.* The "absolute" exclusion before it no longer included the language requiring the discharge to be into the environment; however, there was "no indication that the change in the language was meant to expand the scope of the clause to non-environmental damage." *Id.* Next, the Court of Appeals considered the operative terms of the "absolute" pollution exclusion and found that they constitute terms of art in environmental law, finding that the omission was immaterial and only removed "a redundancy in the language" of the prior form of the exclusion.

In *Potter*, the Fourth Circuit reversed a grant of summary judgment in favor of an insurer because the district court improperly applied the final holding of *Tufco*. The district court failed to interpret the terms "discharge, dispersal, seepage, migration, release or escape" as environmental terms of art. 105 Fed. App'x at 494. Specifically, the Fourth Circuit stated "[w]e are bound to follow *Tufco*'s determination that the clause at issue constitutes a series of terms of art." *Id.* at 495. Accordingly, the Fourth Circuit held that claims "which expressly sound as claims of traditional environmental discharge" were barred by the pollution exclusion and claims

such as "distribution of an adulterated product and the insured's attendant negligence and breach of warranties" were not barred. *Id.* at 497.

In *Whiteville*, petroleum fumes from the insured's service station allegedly permeated a nearby restaurant. 889 F. Supp. at 243. The insurer denied that it had a duty to defend under the policy issued, citing an "absolute" pollution exclusion similar to that present in *Tufco*. *Id.* at 244-45. The pertinent holding simply stated that the claims fell within the plain meaning of the exclusion. *Id.* There was no discussion of ambiguity or *Tufco*. *Id.*

In *Triangle Paving*, the insured was a construction company. 973 F. Supp. at 561. During the course of a job, sediment dislodged and ended up in downstream water on private property. *Id.* at 562. At issue in the case was whether an "absolute" pollution exclusion similar to that present in *Tufco* barred coverage. *Id.* The insured argued that sediment was not the type of traditional environmental pollutant that could fall within the exclusion and the insurer argued that the plain meaning of the exclusion should control. Central to the Court's holding that sediment qualified as a pollutant was the existence of Sedimentation Pollution Control Act, N.C. Gen. Stat. §§ 113A-50 to -66, which stated in clear terms that sedimentation qualified as pollution. *Id.* at 563-64. The Court noted that the insured knew of this treatment because it had to comply with city sedimentation control standards. *Id.* at 564. The insured attempted to argue that it "d[id] not regard ordinary sediment runoff to qualify as a pollutant" and, therefore, the definition of pollutant was ambiguous. *Id.* at 565. The Court responded that "[t]his argument is tautological and defies common logic. If defendant's reasoning were adopted, an insured could always create an ambiguity by claiming that it did not interpret an exclusion to apply to its particular conduct. Ambiguities cannot be manufactured so easily." *Id.* Further, the insured argued that not allowing coverage would contravene the very essence of the policy. *Id.* at 566.

The Court rejected this argument, stating that the policy issued was a commercial general liability policy and not crafted to spread the risk of a specific concern. *Id.* The Court distinguished *Tufco*'s "central business activity" exception by finding that the dispersing sediment was not the intended procedure for the insured and that the resurfacing was intentionally applied in *Tufco* while the sedimentation was "a mere byproduct" of the construction work. *Id.* Further, the cleaning substance was expected while the sedimentation was clearly objectionable. *Id.*

Consistent with Fourth Circuit's guidance in *Potter*, this Court will consider all relevant holdings of *Tufco* in conjunction with general principles of construction in order to determine whether the instant exclusion bars coverage.

### *Tufco's Second Holding*

Central to the second holding, and a predicate to the "central business activity" analysis, is the finding of an ambiguity. The Court does not find an ambiguity in the instant pollution clause. NGC attempts to mesh separate holdings of *Tufco* together by arguing that its drywall does not qualify as a "pollutant"; however, this relates to terms not present in the instant policy and is solely applicable to the third holding. Many of NGC's arguments concern the breadth of the exclusion, not its ambiguity. Accordingly, the Court finds that *Tufco*'s second holding does not prohibit the application of the pollution exclusion.

### *Tufco's Third Holding*

*Tufco*'s third holding related to whether raw material qualified as a pollutant under the terms of the pollution exclusion in that case. Here, the policies differ between the two cases such that a meaningful analysis of this holding is immaterial to the terms in the present case. Whether or not the drywall qualifies as a pollutant for purposes of the policy in *Tufco* is not binding on

this Court.  This is because the sulfur certainly qualifies as a harmful or dangerous "substance" "introduce[ed]" into "structure[s]."

### Tufco's Fourth Holding

The Court again notes the differences between the instant exclusion and the "absolute" pollution exclusion present in *Tufco*.  Environmental terms of art such as discharge or dispersal are not present in the instant exclusion.  Rather, the phrase "presence in or introduction into the environment of any substance, if such substance . . . is alleged to have the effect of making the environment impure, harmful, or dangerous." is the operative language.  NGC does not argue, and the Court has not found, any authority suggesting that these terms can be construed as environmental terms of art.  Further buttressing this conclusion is the fact that both "environment" and "substance" are defined terms.  If these terms are given their defined meaning, then there would unquestionably be no duty to defend.  The sulfur released qualifies as "pollution" because it is a substance that makes the environment impure, harmful, or dangerous. The air of the home qualifies as the environment because it is the air of a structure.  Therefore, the injuries and damages alleged in the Drywall Lawsuits against NGC were caused by pollution of the environment according the terms of the exclusion.

The only way to reach a contrary result would be to determine that "the context clearly requires" a separate definition to be used.  *Westchester Fire Ins. Co.*, 172 S.E.2d at 522.  The Court notes that North Carolina law is very specific in this matter:

> [W]hen presented with policy language that is explicit "[o]ur courts have a 'duty to construe and enforce [the policy] as written, without rewriting the contract or disregarding the express language used . . . The duty is a solemn one, for it seeks to preserve the fundamental right of freedom of contract.'"

*Rouse v. Williams Realty Bldg. Co., Inc.*, 544 S.E.2d 609, 612 (N.C. Ct. App. 2001) (quoting *Kruger v. State Farm Mut. Auto Ins. Co.*, 403 S.E.2d 571, 572 (N.C. Ct. App. 1991).

      Notwithstanding this declaration, the Court notes that North Carolina precedent has not unwaveringly followed this rule with respect to insurance contracts. *See Great Am. Ins. Co. v. C. G. Tate Const. Co.*, 279 S.E.2d 769, 773 (N.C. 1981) (departing from a "strict contractual approach" with respect to notice provisions); *Mims v. Mims*, 286 S.E.2d 779, 788-89 (N.C. 1982) (characterizing *Tate* as a case where the North Carolina Supreme Court "rejected older rules which the Court itself developed in order that justice under the law might be better achieved."); *Tufco*, 409 S.E.2d at 698-70; *Henderson v. Rochester American Insurance Co.*, 118 S.E.2d 885 (N.C. 1961); Kersey, *supra*, § 18.03[6][c] (stating that the majority holds that the "absolute" pollution exclusion only applies to traditional environmental pollution while the minority applies a plain meaning approach). Even though *Great Am. Ins. Co.* abandoned a strict contractual approach, it did not modify the "risk undertaken by the insurer." 279 S.E.2d at 774. The Court is persuaded that construing this exclusion in a manner to afford coverage would effectively rewrite the contract to favor one sophisticated commercial entity over another. It would also significantly expand the scope of the risk undertaken by ACE. Under North Carolina law, this Court must not do so. This Court agrees with Judge Britt by rejecting the argument advanced by NGC: merely because NGC purportedly believed that this type of scenario would be covered does not create an ambiguity in the policy itself. NGC, like all parties, has a duty to read the contracts it enters into. *State Farm Mut. Auto. Ins. Co v. Atlantic Indem. Co.*, 468 S.E.2d 570, 572 (N.C. Ct. App. 1996).

      NGC also argues that this Court should not consider the fact that it purchased products-related pollution liability coverage with National Union during the same time period. *See* (Doc.

113-2, at 14, 26, 54-55). If the Court were to find an ambiguity, this information would certainly be relevant. The fact that NGC purchased an exception to a pollution exclusion in an umbrella policy that *could* ostensibly provide primary coverage (after satisfaction of a self-insured retention and assuming no other exclusions apply) if the instant exclusion barred coverage significantly undermines NGC's arguments regarding the breadth of the pollution exclusion and tends to show that NGC read and understood the policy to mean exactly what ACE now contends it means.

### 2. Whether Stacking is Appropriate

This argument involves whether NGC must pay deductibles for each triggered policy before receiving a duty to defend. This issue has not been clearly addressed by North Carolina courts. Given that the Court has already determined that a duty to defend did not exist, it declines to issue an opinion regarding ACE's stacking argument.

### B. Summary Judgment Arguments Related to National Union

NGC's Motion for Partial Summary Judgment only addresses the *Yee* lawsuit. However, National Union's Motion for Summary Judgment also addresses certain individual lawsuits as well as what once were putative class actions in *Brincku v. National Gypsum CO.*, No. 10-20109 (S.D. Fla.), *Visintin v. National Gypsum Co.*, No. 0:10-cv-60266 (S.D. Fla.), *Brucker v. Lowes Home Centers, Inc. et al.*, No. 2:10-cv-405 (M.D. Fla.), *Cotilla, et. al. v. New NGC, Inc.*, 0:10-cv-60172 (S.D. Fla.), *Johnson v. New NGC, Inc.*, No. 2:10-cv-206 (M.D. Fla.),

Accordingly, the Court will have to address whether either party is entitled to summary judgment regarding the *Yee* lawsuit. After discussing the issues regarding *Yee*, the Court will address whether National Union is entitled to summary judgment regarding individual lawsuits and *Brincku*, *Visintin*, *Brucker*, *Cotilla*, and *Johnson*.

National Union argues that there is no possibility for insurance coverage under the National Union Primary Policies because the claims contained in the complaints of the Drywall Lawsuits post-date the period of coverage, which is November 1, 1993 – November 2, 1999. National Union has three arguments to support its contention. First, the earliest damages claimed by a named plaintiff in the Drywall Lawsuits is 2004. Second, the Consumer Product Safety Commission ("CPSC") remediation guidelines provide that a threshold marker of problematic drywall is that it was installed between 2001 and 2008. Third, in communications with National Union and in filing the instant suit, NGC only provided specific reference to the umbrella policies provided by National Union and failed specifically to mention the National Union Primary Policies until this Court granted NGC leave to amend the complaint on June 18, 2010, to include the National Union Primary Policies.

As an initial matter, National Union's third observation is of no consequence to this inquiry. The fact that NGC failed to refer specifically to the National Union Primary Policies until they amended their complaint may be relevant to the issue of tendering notice of the claim, but it has no bearing on whether a duty to defend existed. Whether or not a duty to defend existed turns on a comparison of the underlying complaint and the contract for insurance to determine if just one claim in the underlying complaint created a mere possibility of coverage under the insurance contract. The Court now turns to comparison of the underlying complaints with the contract for insurance.

1.    Cross-Motions for Summary Judgment regarding *Yee*

a.    Expansive Class Definition

National Union had three options once it became aware of the *Yee* lawsuit faced by NGC. Specifically, it could have sought a declaratory judgment; defended NGC under reservation of

rights; or refused to defend. *See Imperial Cas. and Indem. Co. v. Radiator Specialty Co.*, 862 F. Supp. 1437, 1441 (E.D.N.C. 1994). At its own peril, National Union refused to defend NGC and now must prove that there is no chance that NGC's claim "even *arguably* developed during [NGC's] policy period." *St. Paul Fire & Marine Ins. Co.*, 919 F.2d at 240.

The earliest date that the named plaintiffs in *Yee* allege injuries or damages clearly post-dates the National Union Primary Policies. However, the class definition in the *Yee* Complaint includes "[a]ll owners and residents of homes in the United States that contain defective Drywall manufactured or sold by Defendants that emits excessive amounts of sulfur." (Doc. 81-13, at ¶ 13). This class definition is not temporally restricted.

Based on the expansive proposed class definition, National Union had a duty to defend NGC under the National Union Primary Policies. Granted, the complaints of the Drywall Lawsuits do not explicitly allege wrongdoing by NGC from 1993-1999, but this does not change the standard that governs the duty to defend an insured. National Union is stirred by what it considers to be vexatious litigation. However, its argument regarding the duty to defend may be characterized as a critique of class action lawsuits in general, the risk of which it presumably took into account when it issued these policies.

In North Carolina, the duty of an insurer to defend is triggered by a "mere possibility" of coverage. *Waste Management*, 340 S.E.2d at 377 n.2; *see also Crandell v. Am. Home Assurance Co.*, 644 S.E.2d 604, 608 (N.C. Ct. App. 2007).

National Union's focus on the allegations of the would-be class representative is improper. As the 11th Circuit Court of Appeals explained in *Hartford Acc. & Indemnity Co. v. Beaver*, "the fight over class certification is often the whole ballgame." 466 F.3d 1289, 1294 (11th Cir. 2006) (holding that provider of a commercial general liability policy must defend the

insured prior to certification of the putative class). To allow an insurer to deny coverage based on such a narrow reading of the underlying claims would deprive the insured of the benefit of insurance coverage bargained for in the contract. Further, to focus solely on the named plaintiff in this instance would completely ignore the general notice pleading standards of the Federal Rules of Civil Procedure as well as the underlying purposes of class action litigation. *Cf. Gunnells v. Healthplan Svcs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) (class actions promote judicial economy and efficiency by consolidating numerous individual claims into a single action).

Similarly, National Union's reliance on the CPSC guidelines[7] is improper. (Doc. 126, at 13). As previously explained, an insurer's duty to defend is determined by a comparison of the complaint and the insurance policy. If the claims of the complaint fall within the coverage the insurer has a duty to defend. Additionally, where the complaint fails to assert claims falling within the coverage provided, an insurer's duty to defend may still be found where the insurer "knows or could reasonably ascertain facts, that if proven, would be covered by [the] policy." *Waste Management*, 340 S.E.2d at 377. However, the inverse of this inquiry has not been recognized by North Carolina courts and has been explicitly rejected by the Middle District of North Carolina in a decision affirmed by the Fourth Circuit Court of Appeals. *St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co*., 724 F. Supp. 1173, 1179 (M.D.N.C. 1989), *aff'd* 919 F.2d

---

[7] National Union's reliance on the CPSC guidelines is based on language contained in the "Identification Method" section of the guidelines that provides, "installation of new drywall . . . between 2001 and 2008," as a threshold inspection element to be satisfied in identifying homes with corrosion from the presence of "problem drywall." (Doc. 116-1, at 3). NGC argues (Doc. 129, at 19), and language in the guidelines provide (Doc. 116-1, at 2), that the guidelines address identification of problematic *imported Chinese* drywall. Therefore, it is debatable whether the guidelines are of any relevance to NGC, a wholly domestic producer of drywall. However, as explained in the text on this page, this question need not be definitively answered by the Court because the CPSC guidelines are not properly considered in the context of National Union's duty to defend NGC.

235 (4th Cir. 1990) ("Once a complaint implicates the possibility of coverage, an insurer may not exonerate itself by preliminarily determining that no coverage actually exists despite the allegations of the complaint."); *see also Peace Coll. of Raleigh, Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 5:09-CV-479-FL, 2010 WL 3743539 (E.D.N.C. Sept. 16, 2010). Permitting evidence outside the pleadings to negate allegations in the complaint is akin to a perfunctory review of the merits of the underlying claims against the insured. Such review is not consistent with the duty to defend as understood by the insured party and as explained by North Carolina law pertaining to the interpretation of contracts for insurance.[8]

National Union would have the Court impose upon NGC an affirmative obligation to point to language in the underlying complaint that states the alleged wrongdoing took place during the period of coverage provided before any duty to defend can exist. Such a burden on the insured is not supported by North Carolina precedent. Instead, an insured must only demonstrate that a mere possibility of coverage exists. Accordingly, a putative class action against a producer of drywall in operation since 1993, alleging defects in the drywall produced on behalf of all homeowners in America does present a mere possibility of coverage under commercial general liability insurance policies in effect from 1993 to 1999.

b.     Tender of Notice

National Union argues that its primary insurance policies require NGC to tender notice of underlying claims to National Union for review for coverage and that that they were not aware of the potential for coverage pursuant to these policies until NGC sought leave to amend their

---

[8] Assuming, *arguendo*, that the CPSC guidelines were proper for this Court to consider, this evidence would only go to show that the expansive definition of the class was "groundless, false or fraudulent," in which case National Union would still have a duty to defend NGC. *Waste Management*, 340 S.E.2d at 378.

complaint on June 18, 2010. Therefore, National Union asserts that it would be improper to require them to pay for any defense costs incurred prior to this claimed date for tender of notice.

In North Carolina, the duty to defend arises when the insurer receives actual notice of the underlying action. *Kubit v. MAG Mut. Ins. Co.*, 708 S.E.2d 138, 154 (N.C. Ct. App. 2011). However, contracts for insurance often contain notice provisions that require the insured to communicate to the insurer the occurrence of an event potentially covered by the policy. Where the insured fails to comply with a notice provision, an insurer may be relieved of its duty to defend if the insured's late notice sufficiently frustrates the insurer. *Great Am. Ins. Co. v. C. G. Tate Const. Co.*, 279 S.E.2d 769, 775 (N.C. 1981) (providing three-step inquiry). The instant argument does not involve whether notice was late but whether notice was given in accordance with the provisions of the contract.

The notice provision from the National Union insurance policy is reproduced below:

> **2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**
>
> a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:
>
> (1) How, when and where the "occurrence" or offense took place;
>
> (2) The names and addresses of any injured persons and witnesses; and
>
> (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.
>
> b. If a claim is made or "suit" is brought against any insured, you must:
>
> (1) Immediately record the specifics of the claim or "suit" and the date received; and
>
> (2) Notify us as soon as practicable.
>
> You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

```
c. You and any other involved insured must:
    (1) Immediately send us copies of any
        demands, notices, summonses or legal
        papers received in connection with the
        claim or "suit";
    (2) Authorize us to obtain records and
        other information;
    (3) Cooperate with us in the investigation
        or settlement of the claim or defense
        against the "suit"; and
    (4) Assist us, upon our request, in the
        enforcement of any right against any
        person or organization which may be
        liable to the insured because of injury
        or damage to which this insurance may
        also apply.
```

(Doc. 103-3, at 15-16).

NGC originally provided notice of the *Yee* claim when referencing the "Lake Havusa, AZ" claim. In the original notice, NGC listed several policies in effect from 2003 to 2009 but also stated "[t]his matter is reported under any and all applicable policies whether or not cited." (Doc. 116-2). When the *Yee* class action was filed, NGC then forwarded the complaint to National Union on October 26, 2009 and stated that "[t]his is related to the previously reported Lake Havasu AZ matter." (Doc. 116-3). The complaint itself, along with the earlier provided notice, sufficiently apprised National Union under the notice provisions of its insurance contracts.

National Union does not argue that NGC failed to comply with the requirements of the insurance contract, but instead attempts to import an additional requirement that NGC had to provide specific citation to insurance policies and years of coverage for tender of notice to be proper as to the underlying claims. Where such a particular requirement is lacking on the face of the contract at issue, this Court lacks the authority to infer it.

NGC was only required to comply with the requirements provided in the insurance contract and it was up to National Union to review the underlying suits and determine what obligations it may owe to NGC under any and all applicable policies issued by National Union, whether cited by NGC or not. Accordingly, NGC's tender of the underlying Drywall Lawsuits

was sufficient to provide notice to National Union and National Union can be held responsible for defense costs incurred from that date forward.

2.      National Union's Motion for Partial Summary Judgment

a.      Individual Drywall Lawsuits

The earliest date that an individual Drywall Lawsuit made a claim against NGC is August 15, 2006.[9]  NGC does not seriously argue that the individual lawsuits trigger a duty to defend. *See* (Doc. 129, at 1) (individual plaintiffs "allege injuries which occurred after National Union's primary coverage expired.").  As such, the individual Drywall Lawsuits did not trigger National Union's duty to defend under the policies providing coverage from 1993 to 1999.  Accordingly, National Union's motion will be granted with respect to the individual claims.

b.      Additional Class Actions

Now the Court analyzes whether National Union should be granted summary judgment regarding *Brincku*, *Visintin*, *Brucker*, *Cotilla*, and *Johnson*.

i.      Expansive Class Definition

The majority of National Union's arguments regarding the scope of the class definitions simply reiterate the arguments it made in response to NGC's Motion for Partial Summary Judgment.  Accordingly, the Court will not look solely to the allegations regarding the putative class representative to determine whether the duty to defend is triggered.  Further, the Court will not allow National Union to use the CPSC to determine unilaterally that it has no duty to defend by contradicting the allegations of the class action complaint.

The Court will, however, address new arguments made by National Union.  National Union argues that "the *Cotilla* and *Johnson* complaints assert that National Gypsum's drywall

_____

[9] *Worthington v. National Gypsum* Company, No. 0:10-cv-60779 (S.D. Fla.).

was used in the construction of homes '*between 2004 and present*,' thus limiting the time period in question to drywall installed in 2004 and later and making it irrelevant that the class definition does not repeat this temporal limitation." (Doc. 126, at 15) (citing Doc. 81, Ex. K and L, ¶ 67; Doc. 81, at ¶ 81). National Union argues that *American Mfrs. Mut. Ins. Co. v. Morgan*, 556 S.E.2d 25 (N.C. Ct. App. 2001) compels this conclusion. NGC failed to respond to this argument in its response and instead merely addressed the *Morgan* case in response to the allegations in the *Yee* and *Brucker* complaints. *See* (Doc. 129, at 7, 10). In fact, NGC affirmatively states that "[a]t the heart of the matter are two putative class actions against NGC" and references *Yee* and *Brucker*. (Doc. 129, at 2 & n.1). However, National Union still has not carried its burden with respect to these two actions. This allegation does not necessarily exclude coverage because it does not operate to limit other allegations or define what "drywall" is for the purposes of the respective complaints. *See Washington Housing Authority v. North Carolina Housing Authorities Risk Retention Pool*, 502 S.E.2d 626, 629 (N.C. Ct. App. 1988) (no duty to defend where there are allegations of fact which would *necessarily* exclude coverage) (citation and quotation omitted). Further, it merely provides context and does not operate to limit the class action allegations, which remain temporally unrestricted. For example, a court considering whether notice was appropriate for these proposed classes would not limit notice to those homeowners who purchased drywall after 2004 based on these allegations. Fed. R. Civ. P. 23(c)(2)(B) (providing that the court "must direct notice to class members . . . including individual notice to all members who can be identified through reasonable effort."); *see In re Chinese-Manufactured Drywall Products Liab. Litig.*, No. 09-08030, 2013 WL 499474, at *9 (E.D. La. Feb. 7, 2013) (certifying drywall settlement class under 23(b)(3)). Moreover, the 2004

date of installation of the drywall does not necessarily mean that the drywall was manufactured in 2004.

National Union makes a new argument with respect to *Brincku*. *Brincku* was originally filed on January 12, 2010 as a temporally unrestricted class action lawsuit. *See* (Doc. 81-8, at ¶ 62). The complaint in *Brincku* was amended on June 24, 2010. (Doc. 81-9). The amended *Brincku* action limited the classes who had received drywall that originated in NGC's Apollo Beach Plant. (*Id.* at ¶ 59). NGC admits that the Apollo Beach plant did not begin operations until 2001. (Doc. 85, at ¶ 4). Accordingly, the allegations of the amended *Brincku* action *necessarily* exclude coverage.[10] Therefore, National Union did not have a duty to defend NGC with regard to the *Brincku* class action after June 24, 2010.

ii.      Tender of Notice

National Union reiterates its tender argument by stating that NGC had an affirmative obligation to cite to the pertinent policies in order to trigger to the duty to defend. The policies merely require notice of the claim and do not impose an affirmative obligation upon NGC to cite a particular policy number. Accordingly, the Court will not construe the policies to require such an obligation on the part of NGC, especially given that such a construction would amount to the Court implying additional conditions for the insured to perform, which is contrary to North Carolina's pro-insured methods of construction.

Accordingly, the Court refuses to hold that NGC is only entitled to its defense costs after June 18, 2010.

---

[10] The Court emphasizes the distinction between the use of the CPSC material and the admission by NGC that the Apollo plant did not begin operations until 2001: the pleadings in no way relied upon CPSC as a method to determine the size of the class while the amended *Brincku* complaint limited the class to those persons who received drywall from the Apollo Plant. National Union's use of the CPSC material is argumentative in that it *may* tend to show that defective drywall was produced later in time. National Union's use of the admission, which provides undisputed context for a limiting factor in the size of the class, establishes that there was no duty to defend as soon as the amended complaint was filed.

## VI.    MOTION FOR PRETRIAL CONFERENCE

Also before the Court is Plaintiff's Motion for Pretrial Conference (Doc. 141) to which ACE consents (Doc. 142).  For the reasons therein, the motion is **GRANTED.**  The parties may have a pretrial conference in accordance with Local Rule of Civil Procedure 16.1(G).

**IT IS, THEREFORE, ORDERED THAT**

(1) Defendants ACE and National Union's Motions to Dismiss or Alternatively Stay the Proceedings are **GRANTED** in part and **DENIED** in part. Defendants' Motions are **GRANTED** in part in that this matter is **STAYED** as to all claims made pursuant to the six National Union Umbrella Policies and the three corresponding ACE excess policies.

(2) The scope of the arbitrable issues with regard to the umbrella and excess policies is[11] limited to interpretation of the pollution endorsements in National Union's umbrella policies.

(3) The parties shall submit this arbitrable issue in accordance with their agreement: namely, within thirty (30) days of this Order, each party will choose an arbitrator.  If the two (2) arbitrators are unable to agree within one (1) month upon naming the third arbitrator, such arbitrator shall at the request of either party be selected by the American Arbitration Association in accordance with its rules and procedures.

(4) NGC's Motion for Partial Summary Judgement with respect to Defendant ACE is **DENIED**;

(5) NGC's Motion for Partial Summary Judgment with respect to Defendant National Union is **GRANTED**; specifically, National Union had a duty to defend the *Yee* class action;

---

[11] In framing the scope of arbitration, the Court follows the guidance set forth in *Summer Rain*:  "[t]o send a case such as this to arbitration without first framing the issues to be arbitrated would invite confusion and also additional litigation after rather than before the arbitration."  964 F.2d 1455.

(6) Defendant National Union's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**; specifically

    a.   National Union is granted summary judgment with respect to its arguments regarding individual lawsuits, namely that it did not have a duty to defend because the injuries occurred after the relevant dates in its primary policies;

    b.   National Union is granted summary judgment with respect to its argument that it did not have a duty to defend the *Brincku* action after June 24, 2010; and

    c.   The remainder of National Union's arguments do not entitle it to summary judgment.

(7) Plaintiff's Motion for Pretrial Conference (Doc. 141) is **GRANTED.**  The parties may have a pretrial conference in accordance with Local Rule of Civil Procedure 16.1(G).

Signed: May 12, 2015

Richard L. Voorhees
United States District Judge